59 S.W.3d 352 (2001)
D.J., Appellant,
v.
The STATE of Texas, Appellee.
No. 05-01-00329-CV.
Court of Appeals of Texas, Dallas.
October 16, 2001.
*353 Deborah Farris, Dallas, for Appellant.
William T. (Bill) Hill, Jr., Dallas, for State.
Before Justices BRIDGES, O'NEILL, and FITZGERALD.

OPINION
FITZGERALD, Justice.
We must determine whether clear and convincing evidence supports appellant D.J.'s court-ordered temporary commitment to Terrell State Hospital. We conclude the State has not presented evidence sufficient to meet that burden, and we reverse.

Background
The chain of events leading to D.J.'s commitment began on January 10, 2001, when D.J. walked away from the halfway house where she had been living for two years. The record does not indicate who called the police or why, but the police picked D.J. up that same day and took her to Parkland Memorial Hospital. She was discharged from Parkland, and she made her way by train and bus to her daughter's home. Her daughter then took her back to Parkland and initiated these proceedings. D.J. was placed in protective custody *354 and was being kept at Terrell at the time of the commitment trial.
Trial was held on January 25, 2001. The State called John P. Methner, D.O., a staff psychiatrist at Terrell, as its only witness. Dr. Methner testified that he had conducted a one-hour forensic examination of the proposed patient and reviewed some of her records. Based on his examination, Dr. Methner concluded D.J. was mentally ill and that she was likely to cause serious harm to herself. Moreover, he concluded D.J. suffered from severe distress, her condition was deteriorating, and she was unable to make rational decisions concerning her treatment. D.J. testified on her own behalf, answered questions about her behavior and condition, and asked to be released.[1] At the conclusion of the hearing, the trial court granted the State's petition for temporary commitment for a period not to exceed ninety (90) days. This appeal followed.[2]

Involuntary Commitment
A trial court may order temporary inpatient mental health services when clear and convincing evidence establishes that:
(1) the proposed patient is mentally ill; and
(2) as a result of that mental illness the proposed patient:
(A) is likely to cause serious harm to himself;
(B) is likely to cause serious harm to others; or
(C) is:
(i) suffering severe and abnormal mental, emotional, or physical distress;
(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's needs, including food, clothing, health, or safety; and
(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.
Tex. Health & Safety Code Ann. § 574.034(a) (Vernon Supp.2001). To satisfy the clear and convincing standard, evidence must include both expert testimony and proof of "a recent overt act or a continuing pattern of behavior" that confirms findings under subsection 2. Id. § 574.034(d). We review a fact finding made by clear and convincing evidence to determine whether the trial court could reasonably have found the fact was "highly probable." Mezick v. State, 920 S.W.2d 427, 430 (Tex.App.-Houston [1st Dist.] 1996, no writ). The evidence must produce a firm belief or conviction as to the truth of the facts. Id. We can sustain an insufficient evidence point of error only if we conclude, after reviewing the entire record, that the fact finder could not have reasonably found the fact was established by evidence that meets the statutory standard. Id.

Mental Illness
First, the statutory standard requires a finding that the proposed patient *355 is mentally ill. Tex. Health & Safety Code § 574.034(a)(1). Dr. Methner testified that D.J. suffered from paranoid schizophrenia, a mental illness. At trial, D.J. conceded Dr. Methner's expertise, and her brief does not challenge his diagnosis. We have no reason to challenge that diagnosis either. However, expert testimony confirming mental illness, standing alone, will not support an involuntary commitment. See, e.g., T.G. v. State, 7 S.W.3d 248, 252 (Tex.App.-Dallas 1999, no pet.) ("[e]vidence which merely reflects that an individual is mentally ill is no evidence that the statutory standard has been met"); Mezick, 920 S.W.2d at 430 ("expert diagnosis alone is not sufficient to confine a patient for compulsory treatment").

Serious Harm or Severe Distress and Deterioration of Ability to Function
The second prong of the statutory standard requires that the proposed patient meet at least one of the criteria concerning serious harm to herself or others, or severe distress and deterioration of functional ability. Dr. Methner testified that, as a result of her mental illness, D.J. met two of those criteria: she was likely to cause serious harm to herself; and she (i) was suffering severe and abnormal mental, emotional or physical distress, (ii) was deteriorating in her ability to function independently, and (iii) was not able to make a rational and informed decision as to whether to submit to treatment. Again, these opinions standing alone will not suffice for commitment; instead, the expert's opinions must be supported by a showing of the factual bases on which his opinions are grounded. Mezick, 920 S.W.2d at 430.
When asked why he believed D.J. was likely to cause harm to herself,[3] Dr. Methner testified:
Essentially, this patient gets off into a psychotic paranoid delusion. At this particular time, God talks to her and tells her that she can only eat two chicken nuggets a day, and this has been going on in her placement home for a period of time as she's deteriorated, and they've become concerned about her minimal eating and her minimal drinking and her nutrition. She's become more non-compliant to medication and more bizarre and deteriorated.
She became confused over the last two days and was wandering, and they watched her. Eventually, she wandered away from [the halfway house where she was living] and was eventually picked up.
Fairly read, the doctor identified three areas of concern: poor nutrition, noncompliance with medication, and "wandering" away from her home. Our review of the record indicates none of these issues was sufficiently evidenced at trial to support a finding that D.J. was likely to harm herself or that she was distressed and deteriorating within the meaning of the statute.
Nutrition
D.J.'s nutrition was the topic given the most attention at trial. Dr. Methner relied upon a note from D.J.'s admission at Parkland that reported her saying God spoke to her and told her to eat only two chicken nuggets a day. He also relied upon a statement given to the police by D.J.'s daughter, which similarly stated that D.J. had "only eaten 1 or 2 chicken nuggets a day for 12-25 days." Finally, the *356 doctor referred to a communication from someone at the halfway house, expressing concern about D.J.'s reduced intake of both food and fluids. The doctor conceded that D.J. had not told him what she had eaten or that God had directed her to eat in a particular way. He also testified that lab tests conducted on D.J. at the time of her admission at Parkland did not indicate any marked dehydration or malnutrition. Since she had been at Terrell, she had been eating "appropriately," according to the doctor.
D.J. testified she had in fact been eating chicken nuggets and cookies for some number of days before she was taken to Parkland, and she conceded that diet was not nutritionally sound. However, she testified she had been cooking and eating three meals a day at the halfway house until the residents were forbidden to cook anymore. An employee apparently cooked for the clients at the house, but, according to D.J., she was not a client and so she had to purchase her own food. The chicken and cookies were all she could afford. Although part of the statutory standard is satisfied by evidence the proposed patient is unable to provide for her basic needs, the statute specifically excepts "reasons of indigence" as a basis for such a finding. See Tex. Health & Safety Code § 574.034(a)(2)(C)(ii). None of D.J.'s records contradicts her testimony that she was eating what she could afford to buy. Moreover, D.J. testified that she had lost only four pounds over an indefinite period of time and that she was wearing the same size fourteen clothes she had worn for some time. On cross-examination, Dr. Methner admitted he had not compared D.J.'s weight from her earlier records with her current weight. Significantly, the record supports the conclusion that when she had access to appropriate meals, she ate them.
Medication
Dr. Methner's testimony concerning D.J.'s medication was confused at best. Again, he relied on the records and reports of the police, Parkland, and the halfway house to the effect that D.J. was not consistently taking her medication. However, Dr. Methner was completely unaware of what medications D.J. was supposed to be taking. He testified he believed she was taking "an anti-psychotic," but he had no record verifying that. D.J.'s records did not indicate she was prescribed any medications for physical reasons, e.g., hypertension or diabetes. And D.J. testified that when she had last been at Terrell several months earlier, she had not been prescribed any medications.[4] It is clear from the record that D.J. had not been taking any medications while she was at Terrell awaiting the January 25th trial, and Dr. Methner indicated she was eating and sleeping adequately without them.
Wandering
Again, the record does not indicate how or why D.J. first left the halfway house. However, it is clear she effectively managed to take a train and a bus to her daughter's home after being discharged from Parkland. Although the doctor testified that D.J. could be confused as to her location,[5] we believe D.J. is persuasive when she describes her trip to her daughter's *357 home and says, "that's not wandering. I know my directions."
The record does contain some evidence of disturbing behavior. D.J. herself testified she had experienced a "dehumanizing" process that included undergoing laser surgery by satellite, being implanted with electronics, and being used as a guinea pig by some unknown technological force. Dr. Methner called some of D.J.'s behavior "psychotic." However, the cases make clear that psychotic behavior alone is insufficient to justify commitment on the grounds of mental distress and the deterioration of the ability to function independently. See T.G., 7 S.W.3d at 252; Johnstone v. State, 961 S.W.2d 385, 389 (Tex. App.-Houston [1st Dist.] 1997, no writ); Broussard v. State, 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no writ). Nor does it appear from the record that these "delusions" are likely to cause D.J. to harm herself.
Dr. Methner testified D.J. was not suicidal. He said she was sleeping adequately, and she did not require either seclusion or physical restraint while she was at Terrell. He identified no recent overt act that tended to confirm his conclusions that she was likely to harm herself or that she was in severe distress and deteriorating in her ability to function. Nor do any of the issues identified by Dr. Methner describe a pattern of behavior that would tend to confirm such conclusions. Compare, e.g., Mezick, 920 S.W.2d at 430-31 (patient with ongoing pattern of manic and depressive behaviors had completely stopped eating, lost thirty pounds, "steadfastly" refused all medications, and threatened suicide).

Conclusion
We have reviewed the entire record of evidence presented at the commitment hearing. We conclude the trial court could not reasonably have found by clear and convincing evidence that it was highly probable D.J. was likely to cause serious harm to herself. Likewise, we conclude the trial court could not reasonably have found by clear and convincing evidence that it was highly probable D.J. was in severe distress and deteriorating in her ability to function. Specifically, we conclude there was no evidence of a recent overt act or of a continuing pattern of behavior that tended to confirm those trial court findings. See Tex. Health & Safety Code § 574.034(d); see also T.G., 7 S.W.3d at 252. Accordingly, we sustain D.J.'s single point of error, reverse the trial court's judgment, and deny the State's petition for court-ordered temporary inpatient mental health services.
NOTES
[1] Relevant details of Dr. Methner's testimony and D.J.'s testimony are discussed below.
[2] Although the 90-day commitment period has run, this appeal is not moot. We recognize that an inappropriate commitment has effects which are "manifestly severe and prejudicially unfair," and this appeal is an opportunity for some mitigation of those effects. See State v. Lodge, 608 S.W.2d 910, 912 (Tex. 1980).
[3] Dr. Methner was not specifically asked about the factual grounds of his opinions concerning distress and deterioration. However, it is apparent from his testimony that he believed the same fundamental concerns supported both of his conclusions under subsection 2 of the statute.
[4] In November 2000, D.J.'s daughter had initiated a proceeding similar to this one for involuntary commitment. D.J. was required to stay at Terrell until her hearing. At that hearing, the trial court determined there was not sufficient evidence for commitment, and D.J. was released from Terrell.
[5] Dr. Methner testified it was difficult to evaluate D.J.'s "goal directing and organized thinking and integration."