183 S.W.3d 489 (2005)
IN RE F.M.
No. 14-04-00981-CV.
Court of Appeals of Texas, Fourteenth District, Houston.
December 22, 2005.
*491 Richard H. Branson, League City, for appellant.
Donald Glywasky, Robert V. Shattuck Jr., Galveston, for appellee.
Panel consists of Justices EDELMAN, SEYMORE, and GUZMAN.

OPINION
CHARLES W. SEYMORE, Justice.
Appellant, F.M., appeals from an order of commitment for temporary inpatient mental health services and an order to administer psychoactive medication. In three issues, F.M. challenges the sufficiency of the evidence to support the trial court's orders. We reverse and render.

I. BACKGROUND
On September 8, 2004, F.M. was taken by ambulance to the University of Texas Medical Branch ("UTMB") from her group home where she had stayed up all night drawing. F.M. had announced that she would become a doctor and buy a red truck, and was cheerleading, jumping, and laughing.
Approximately two weeks later, a psychiatrist at UTMB filed an application for court-ordered temporary mental health services. The application stated that F.M. was "irritable and easy to anger" and "refusing to take medications." Following a hearing on September 29, 2004, the trial court ordered that F.M. be committed to Austin State Hospital for inpatient care not to exceed 90 days.[1] Also on September 29, 2004, following a separate hearing, the trial court signed an order authorizing the Department of Health and Human Services to forcibly administer the following classes of psychoactive medication: antidepressants, antipsychotics, aniolytics/sedatives/hypnotics, mood stabilizers, and stimulants.

II. STATUTORY REQUIREMENTS FOR COMMITMENT
A trial court may order a mentally ill patient to receive court-ordered temporary inpatient mental health services if the State proves, by clear and convincing evidence, that the proposed patient is mentally ill, and as a result of that mental illness, the proposed patient:
(A) is likely to cause serious harm to himself;
(B) is likely to cause serious harm to others; or
(C) is:
(i) suffering severe and abnormal mental, emotional, or physical distress;
(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for *492 the proposed patient's basic needs, including food, clothing, health, or safety; and
(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.
TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (Vernon 2003).
The statute further provides:
To be clear and convincing ... the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:
(1) the likelihood of serious harm to the proposed patient or others; or
(2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.
TEX. HEALTH & SAFETY CODE ANN. § 574.034(d) (Vernon 2003) (emphasis added).
The judge or jury must specify which criterion under the Texas Health and Safety Code forms the basis for the commitment order. TEX. HEALTH & SAFETY CODE ANN. § 574.034(c) (Vernon 2003). In addition, the overt act or continuing pattern of behavior "must relate to the criterion on which the judgment is based." See J.M. v. State, 178 S.W.3d 185, 193 (Tex. App.-Houston [1st Dist.] 2005, no pet. h.) (citing In re C.O., 65 S.W.3d 175, 181 (Tex.App.-Tyler 2001, no pet.)).
Here, the trial court found that F.M. is mentally ill, and as a result of that mental illness, the following two statutory criteria were satisfied: (1) F.M. was likely to cause serious harm to herself; and (2) F.M. was suffering severe distress; experiencing substantial deterioration of her ability to function independently; and unable to make a rational and informed decision about whether to submit to treatment. See TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(A), (C).

III. LEGAL SUFFICIENCY
In her first and third issues, F.M. contends the evidence is legally insufficient to support the order for temporary mental health services and the order to administer psychoactive medication.
Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." State v. Addington, 588 S.W.2d 569, 570 (Tex.1979) (per curiam). When the burden of proof is heightened to a clear and convincing standard, the standard of review for legal sufficiency of the evidence is also heightened. City of Keller v. Wilson, 168 S.W.3d 802, 817 (Tex.2005); see Campbell v. State, 68 S.W.3d 747, 758-59 (Tex.App.-Houston [14th Dist.] 2001), aff'd 85 S.W.3d 176 (Tex.2002) (noting the heightened standard is required to protect the rights of the individual). We must consider all evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a belief or conviction that its findings were true. In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002). We must also assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. Id.
F.M. does not challenge the finding that she is mentally ill, but contends the evidence is legally insufficient to support the finding that she meets either of the two additional criteria. Specifically, she contends the State failed to show a recent overt act or continuing pattern of behavior that tends to confirm either (1) the likelihood *493 of serious harm to herself, or (2) her distress and the deterioration of her ability to function. See TEX. HEALTH & SAFETY CODE ANN. § 574.034(d).

A. Likelihood of Serious Harm
Dr. Michael O'Boyle, a board-certified psychiatrist at UTMB, was the sole witness to testify on behalf of the State at the commitment hearing. Based on his evaluation, Dr. O'Boyle determined that F.M. was mentally ill, and related her diagnosis as bipolar manic. During the hearing, the State asked Dr. O'Boyle if, as a result of her mental illness, F.M. was likely to cause serious harm to herself. Dr. O'Boyle replied, "I believe so, yes." The State then asked Dr. O'Boyle if there were any recent overt acts or continuing patterns of behavior that tended to confirm his testimony. In response, Dr. O'Boyle testified as to F.M.'s refusal to submit to medical treatment and her "mood ability."

1. Refusal to Submit to Medical Treatment
We will first address the State's argument that F.M.'s refusal to submit to medical treatment constitutes an overt act or a continuing pattern of behavior tending to show a likelihood of serious harm under the Texas Health and Safety Code. At the hearing, Dr. O'Boyle testified that F.M. had been "pretty consistently" refusing her medication. He further testified that his main concern was that F.M. had a history of breast cancer. Dr. O'Boyle explained that he had planned to recommend that F.M. be committed to UTMB for her to receive radiation treatment. However, he changed his recommendation to commitment to Austin State Hospital because F.M. refused to submit to the treatment.[2]
This court has previously held that testimony concerning a proposed patient's refusal to take prescribed medications together with unspecified "actions at home" and "bizarre behavior at the emergency room" constituted legally and factually sufficient evidence to support an involuntary commitment order. See In re G.H., 94 S.W.3d 115, 115-17 (Tex.App.-Houston [14th Dist.] 2002, no pet.). The dissent expressed concern that the majority declined to follow the preponderance of Texas authority holding a patient's refusal to take medication is insufficient evidence of a recent overt act or continuing pattern of behavior.[3]See id. at 117; see also, G.H. v. *494 State, 96 S.W.3d 629, 635 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (disagreeing with the analysis of this court's majority opinion in In re G.H.). The In re G.H. majority relied on three cases in which other courts indicated that refusal to take medication may affect a proposed patient's ability to function and make rational decisions about treatment under the third criterion of commitment. See In re G.H., 94 S.W.3d at 117 n. 2 (citing In re K.D.C., 78 S.W.3d 543, 550 (Tex.App.-Amarillo 2002, no pet.); D.J. v. State, 59 S.W.3d 352, 356-57 (Tex.App.-Dallas 2001, no pet.); Mezick v. State, 920 S.W.2d 427, 430 (Tex.App.Houston [1st Dist.] 1996, no writ)). Accordingly, In re G.H. should not be cited to support the contention that refusal to take medication, without more, is an overt act or continuing pattern of behavior as contemplated by the Health and Safety Code.
Both a medical and legal determination of the grounds for involuntarily committing a person to a mental hospital are required before the State is justified in depriving a mentally ill person of his or her liberty. Moss v. State, 539 S.W.2d 936, 950 (Tex.Civ.App.-Dallas 1976, no writ); see O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) ("A finding of `mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement."); Humphrey v. Cady, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972) (noting that the jury serves the "critical function" in a commitment proceeding of introducing a lay judgment "concerning the kinds of potential harm that justify the State in confining a person for compulsory treatment"). Evidence of an overt act or continuing pattern of behavior is specifically required by the Texas Health and Safety Code in addition to expert opinion. TEX. HEALTH & SAFETY CODE ANN. § 574.034(d). Evidence establishing that an individual is mentally ill and in need of treatment alone does not satisfy the statutory standard. In re K.D.C., 78 S.W.3d at 550.
If we were to adopt the State's position and hold that refusal of medication or medical treatment per se can constitute an overt act or continuing pattern of behavior sufficient to fulfill the clear and convincing standard, the medical and legal determination would become conflated. A person diagnosed with mental illness could be forced to submit to treatment based on nothing more than the very fact that he or she did not wish to be treated. See *495 J.M., 178 S.W.3d at 195 (noting a similar tautology in discussing evidence regarding a proposed patient's refusal to cooperate with treatment). By this circular reasoning, the State would have carte blanche to involuntarily commit anyone who had been diagnosed with mental illness and either preferred to pursue alternative means of treatment, or determined, contrary to psychiatric advice, that the negative side-effects and other risks of available medication outweighed the benefits. This reasoning poses a grave concern, especially for those relying on State psychiatric advice who are unable to afford the luxury of obtaining an independent second opinion.[4]
The State relies on Johnson v. State, in which the San Antonio Court of Appeals reasoned that an individual who cannot make a rational decision to receive treatment poses a threat to his own well being. 693 S.W.2d 559, 563 (Tex.App.-San Antonio 1985, no writ) (emphasis added). However, the appellant in Johnson did not challenge the sufficiency of the evidence to support the commitment order; rather, she challenged the constitutionality of the commitment statute. Id. Johnson's argument was based on the United States Supreme Court's holding in O'Connor v. Donaldson that there is no constitutional basis for confining the mentally ill if "they are dangerous to no one and can live safely in freedom." 422 U.S. at 575, 95 S.Ct. 2486. She argued that the third criterion for commitment in Texas was overbroad because it allowed nondangerous individuals to be involuntarily committed.[5]Johnson, 693 S.W.2d at 563. The San Antonio Court of Appeals held that the third criterion incorporated a dangerousness standard in keeping with due process requirements because an individual who cannot make a rational decision concerning treatment poses a threat to his own well being. *496 Id. In a subsequent opinion, the court clarified that the act of refusing medication was not an overt act sufficient to support a finding of clear and convincing evidence under the third criterion, but was instead relevant to the inquiry concerning a proposed patient's ability to make a rational and informed treatment decision. In re Breeden, 4 S.W.3d 782, 789-90 (Tex.App.-San Antonio 1999, no pet.).
The present case illustrates the danger of divorcing the proposed patient's underlying rationale from the decision to refuse treatment itself. It is not clear from the record which medication(s) F.M. refused. It is also not clear when or how often F.M. refused the medication(s). According to F.M.'s medical records, she was refusing 30 m.g. dosages of a drug, trade name Abilify, for very specific reasons concerning possible side effects. One note indicated that she would accept a different drug, trade name Seroquel, and the plan was to "titrate Seroquel up" if she continued to refuse Abilify. There was no further indication as to whether the treatment plan was carried out or whether she was given the option to switch to Seroquel or to a lower dosage of Abilify.
During the hearing, Dr. O'Boyle testified that when he asked F.M. about taking Abilify, F.M. became angry and said the medication caused her cancer, causes her to drink alcohol and caffeine, and "just makes things worse." F.M.'s medical records also reflect her concern that Abilify played a role in causing her cancer. However, the record contains no reference to carcinogenicity studies concerning the medication. Nor is there any indication as to whether F.M. was attempting to use alcohol and caffeine as self-help mechanisms to combat other side effects of the drug. The record does not reflect any inquiry into the reasons behind F.M.'s statements, and there is no evidence to discredit her explanation.
Dr. O'Boyle also testified at the hearing that F.M. was "pretty consistently refusing medications." However, it is not clear whether Dr. O'Boyle was testifying that F.M. was refusing to take all of her medications, or whether he was specifically referring to her refusal to take Abilify. F.M.'s medical records indicate that she was accepting medications to help her sleep and for pain and anxiety. Further, while the record reflects that F.M. had become delusional, there is no indication that her delusions were related to or had an effect on her reasons for refusing medical treatment. See Protection of S.E.W., Nos. 14-02-00602-CV, 14-02-00603-CV, 2002 WL 31599910, at *3 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (not designated for publication) (holding evidence sufficient to support commitment order under third criterion when appellant refused medicine because she was convinced her medicine was poisonous and caused bladder infections, but repeated tests revealed no physical evidence of appellant's perceived infections and appellant was found wandering in a church). According to F.M.'s medical records, she complained that Abilify caused insomnia, gave her nightmares, made her angry, caused muscle cramps in her left calf, and caused her to wet the bed and make involuntary visits to the toilet with urine running down her legs. However, the record does not indicate whether insomnia, muscle cramps, hostility, urinary incontinence, or any other adverse events complained of were known to be side-effects of Abilify. Nor is there any indication as to whether F.M. was actually suffering from these side-effects, or whether the side-effects were paranoid figments of imagination brought on by her mental illness.
*497 The significance of a refusal to accept, not only psychiatric medication, but any other kind of medication or medical procedure, cannot be assessed in the absence of expert opinion concerning recommended treatment, risks, alternatives, and consequences. With respect to cancer treatment, Dr. O'Boyle testified that F.M. had a "history of breast cancer," and that she complied with a biopsy, but had recently refused to undergo a radiation treatment. F.M.'s medical records indicate that the results of that biopsy were negative. F.M. also testified at the hearing and responded to questions about her refusal to receive radiation treatment. She said that according to her nurse, she needed to take calcium for her cancer. She also stated her initial reason for refusing the radiation treatment was that it would cause "so much fatigue." Her further explanation was rambling and incoherent, but she concluded that she "[felt] fine about it." An entry in her medical records on the day before the hearing notes that she "initially refused then later agreed to go to radiation oncology for breast radiation and went running down the hallway to catch transportation personnel."
The refusal of one radiation treatment is not, without more, indicative of an irrational decision. F.M. might have needed more time to assess her treatment options, or as her testimony suggests, she might simply have not felt well enough to submit to an exhausting treatment procedure that particular day. F.M. also testified that her nurse had told her that she needed to take calcium. However, F.M.'s nurse did not testify at the commitment hearing, nor was there testimony from F.M.'s oncologist or other treating physician. We therefore do not know if F.M. misinterpreted dietary advice, or was, in fact, informed by a nurse of legitimate studies suggesting that calcium might be effective in the prevention or treatment of breast cancer.
We do not find enough information in this record for a fact finder to evaluate whether F.M. was able to make treatment decisions on a rational basis. If her refusal of psychiatric medication and a radiation treatment alone were overt acts sufficient to meet the clear and convincing standard under the first criterion, the strict requirements of the third criterion concerning the proposed patient's ability to function and make a rational treatment decision would be undermined.
Although psychiatric treatment has advanced significantly from the days of the lobotomy, there is still much art and guesswork involved. See, e.g., Addington v. Texas, 441 U.S. 418, 430, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (noting that psychiatric diagnosis is "to a large extent based on medical `impressions' drawn from subjective analysis and filtered through the experience of the diagnostician"); O'Connor, 422 U.S. at 584, 95 S.Ct. 2486 (Burger, J., concurring) (noting that "despite many recent advances in medical knowledge, it remains a stubborn fact that there are many forms of mental illness which are not understood ..."). The inherent uncertainties in diagnosis as well as the severe side-effects and sometimes questionable efficacy of psychoactive medication have been judicially recognized. See Washington v. Harper, 494 U.S. 210, 229-30, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (noting that the purpose of antipsychotic drugs is "to alter the chemical balance in a patient's brain" but "the drugs can have serious, even fatal, side effects."); see also Addington, 441 U.S. at 429-30, 99 S.Ct. 1804; Moss, 539 S.W.2d at 950-51. There is "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Harper, 494 U.S. at 220, 110 S.Ct. 1028. In fact, *498 the "forcible injection" of any medication "into a nonconsenting person's body represents a substantial interference with that person's liberty." Riggins v. Nevada, 504 U.S. 127, 134-35, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (citing Harper, 494 U.S. at 229, 110 S.Ct. 1028). We hold that the mere assertion of a person's liberty interest in refusing medication or other medical treatment cannot be considered an overt act sufficient to meet the clear and convincing standard for involuntary commitment.

2. "Mood Ability"
During the hearing, Dr. O'Boyle testified that he had noticed F.M.'s "mood ability." He said that she could get "very angry very quickly," and although she had never struck him, she had been "in his face" a few times and he felt it wise to back off. The State argues that Dr. O'Boyle's testimony as to F.M.'s "mood ability" is evidence of an overt act sufficient to meet the clear and convincing standard. We disagree. Dr. O'Boyle's testimony described a general trait or disposition, and not a specific overt act or pattern of behavior. Although he said that F.M. had been "in my face a few times," he did not provide any further factual elaboration as to the dates, times, and circumstances surrounding such incidents. Even if there was evidence of a specific overt act or pattern of behavior showing violence or hostility toward a third person, that evidence would tend to show that F.M. was a danger to others, not herself. See J.M., 178 S.W.3d at 193 (holding that aggressive behavior toward family did not tend to confirm the likelihood that the proposed patient would cause serious harm to herself); but see Taylor v. State, 671 S.W.2d 535, 538 (Tex. App.-Houston [1st Dist.] 1983, no writ) (holding that evidence of provocative and hostile behavior toward family and third parties "could foreseeably result in someone acting in a more violent manner toward appellant in the future"). The recent overt act or continuing pattern of behavior proven by the State must be related to the criterion supporting the trial court's judgment. J.M., 178 S.W.3d at 193. Here, Dr. O'Boyle testified he did not believe that F.M. was a danger to others, and the trial court did not find that F.M. posed a danger to others as a basis for commitment. To the extent that hostile and provocative behavior may foreseeably result in an increased risk of retaliation by a third party, this potential risk alone is not legally sufficient to show that F.M. is likely to cause serious harm to herself.
Because we find no evidence of an overt act tending to confirm that F.M. was likely to cause serious harm to herself, the evidence is legally insufficient to support a commitment order under the first criterion of the Texas Health and Safety Code.

B. Inability to Function
Alternatively, the State argues that the evidence was sufficient to meet the third criterion for commitment: severe distress and substantial deterioration in ability to function. See TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(C). The State, tracking the language of the Texas Health and Safety Code, asked Dr. O'Boyle: (1) whether F.M. was "suffering severe and abnormal mental, emotional or physical distress"; (2) whether she was "also experiencing substantial mental or physical deterioration of her ability to function independently"; (3) whether that deterioration was "exhibited by her inability except for any reasons of indigence to provide for her basic needs like food, clothing, health or safety"; and (4) whether she "was able at all times to make a rational and informed decision about whether or not to submit to treatment." Dr. O'Boyle answered, "yes" to the first *499 three questions, and "no" to the fourth. With respect to acts or patterns of behavior tending to confirm F.M.'s "distress and deterioration and inability to function," Dr. O'Boyle referred to her refusal to take Abilify.
Expert opinions recommending involuntary commitment must be supported by a showing of the factual basis on which they are grounded. In re J.S.C, 812 S.W.2d 92, 95 (Tex.App.-San Antonio 1991, no writ). It is not enough to merely recite the statutory criteria, but the expert should describe the specific behavior of the proposed patient which forms the basis for his or her opinion. J.M., 178 S.W.3d at 193; Broussard v. State, 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no writ); Moss, 539 S.W.2d at 950. As discussed above, because the significance of refusal to take medication cannot be logically separated from an expert's bare opinion regarding diagnosis and recommended treatment, the mere refusal to take medication is not an overt act or continuing pattern of behavior sufficient to support a finding of clear and convincing evidence. There must be a further showing, by expert testimony or other evidence, that the refusal "tends to confirm" the relevant criterion for commitment. Absent this showing, we conclude that F.M.'s refusal to take medication is not evidence of an overt act or continuing pattern of behavior sufficient to support commitment under the third criterion.
The State also points to notes contained in F.M.'s medical records wherein a member of the staff reports that F.M. had "too much interference from family and friends," did not want staff "to talk about her to anyone," and had yelled at her ex-husband over the phone and told him not to call her again. The State argues that there is a continuing pattern of behavior demonstrating F.M.'s inability to provide her own shelter because F.M. refuses contact with family members on whom she would rely to place her in an apartment. However, the State's mere speculation that F.M. will not be able to provide her own shelter because she yelled at her ex-husband and thought her family and friends were interfering too much is not sufficient to meet the clear and convincing standard for involuntary commitment.
Not only is there no evidence of an overt act or continuing pattern of behavior to support the third criterion for commitment, but there is also no evidence of a "substantial deterioration" in F.M.'s "ability to function independently." See TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(C)(ii). No testimony was introduced at the commitment hearing with respect to F.M.'s ability to function on a day-to-day basis. Notes in F.M.'s medical records to this effect indicate that she maintained positive oral hygiene and "dressed appropriately," although a note on one occasion indicated that she appeared "mildly disheveled." In fact, the only evidence suggesting that F.M. was impeded in everyday functioning is from F.M.'s own complaints regarding, for example, the insomnia and urinary incontinence caused by her medication.
Finally, the State relies on evidence of F.M.'s delusional thoughts about talking with ghosts, working for President Bush, and building a bed and breakfast. However, this evidence of delusional behavior merely confirms that F.M. is mentally ill. It does not rise to the level of an overt act or continuing pattern of behavior necessary to support a commitment order. See T.G. v. State, 7 S.W.3d 248, 250-52 (Tex.App.-Dallas 1999, no pet.) (holding evidence of patient's delusion that she was in military and mail carrier was responsible for her welfare not sufficient to support commitment order); Broussard, 827 *500 S.W.2d at 622 (holding evidence of patient's six or seven prior hospitalizations, psychotic and hostile behavior, and repeated refusals to take medication insufficient to support commitment order).
We find no evidence of a recent overt act or continuing pattern of behavior tending to confirm F.M.'s distress and deterioration in ability to function. Further, as discussed above, there is no evidence to support the findings that F.M. was unable to provide for her basic needs and unable to make a rational and informed decision as to whether to submit to medical treatment. Accordingly, we hold the evidence legally insufficient to support an order for involuntary commitment under the third criterion of the Texas Health and Safety Code.

IV. ORDER TO ADMINISTER PSYCHOACTIVE MEDICATION
F.M. also contends that the evidence is legally insufficient to support the trial court's order to administer psychoactive medication. A trial court may issue an order authorizing the administration of psychoactive medication only if the proposed patient is under a valid order for temporary or involuntary mental health services. TEX. HEALTH & SAFETY CODE ANN. § 574.106(a)(1). Because we find the evidence legally insufficient to support the trial court's order of temporary commitment, we also find the evidence legally insufficient to support the order to administer psychoactive medications. See K.T. v. State, 68 S.W.3d 887, 894 (Tex.App.-Houston [1st Dist.] 2002, no pet.). We sustain appellant's first and third issues.[6]
We reverse the Order For Temporary Inpatient Mental Health Services and the Order to Administer Psychoactive Medication, and we render judgment denying the State's applications to commit F.M. for court-ordered temporary mental health services and to administer psychoactive medications.
EDELMAN, J., dissenting.
GUZMAN, J., concurs in result only without an opinion.
RICHARD H. EDELMAN, Justice, dissenting.
Among other things, F.M.'s doctor testified, and the trial court found, that she is mentally ill (bipolar manic) and that, as a result of that mental illness, she is: suffering severe and abnormal mental or emotional distress; experiencing substantial mental deterioration of her ability to function independently, as exhibited by her inability to provide for her basic needs, including safety; and unable to make a rational and informed decision as to whether or not to submit to treatment.[1] The evidence at the hearing included her doctor's testimony that: (1) she can get very angry very quickly; (2) she had refused at least one cancer radiation treatment; (3) when asked by her doctor about taking a medication called Abilify, which she had previously told him was "really good medicine," she became angry and told him that it had caused her cancer and caused her to drink alcohol and caffeine; (5) immediately after her previous release from the treatment facility, she was brought back; (6) she had been inconsistent in following through with treatment after agreeing to it; that is, she had told her doctor in the past that she would follow a suggested course of action, but then refused for reasons that made sense to her; (7) she *501 doesn't believe she has bipolar illness; and (8) if she is not treated with psychoactive medications, she will continue to deteriorate. In addition, F.M.'s own testimony included the following:
Q. [B]ut you're telling me now and you've told the doctor that you would be agreeable to not only start but continue and stay with the radiation treatments or whatever medications they wanted to give you for your cancer; is that correct?
A. For my cancer?
Q. Right. Let's start with that first because that's why this all changed around because you were refusing treatment for your cancer.
A. The only thing I need for my cancer is calcium according to my nurse.
Q. Well, okay, but the doctor thinks you may need something more than that and you're not taking that and he can't do anything about it which is why he's recommending you be sent to Austin.
A. Well, the reason I don't take that is because it's on my allergy strap considered by the gentleman in the biopsy room, okay, and I have to stay away from caffeine because I'm an LSD victim. Caffeine, alcohol, marijuana, stress, blinking lights and the mercury drug report fatigue. And the reason I initially denied the radiation was because I was afraid I would fall into so much fatigue but I saw Dr. Hatch on TV yesterday at dinner time and then the next day at lunch time with the names of Dr. Hoff and a gentleman that I saw there the other day, and she told me it's five days perfected and that it's truly state of the art as my surgeon said. Everything was state of the art.
* * * *
Q. Is there anything else that you want to tell the judge?
A. I'm not bipolar or manic depressive. I am an LSD victim which appears that way which I told Dr. Early. I told the signs. I even had blinking lights in the fire drill the other day and a "blink, blink" fluorescent light this morning in my bathroom.... And I am Post Traumatic Stress Disorder because of my soldier in Cambodia missing in action.
Because I believe this evidence is legally sufficient to show recent overt acts and/or a continuing pattern of behavior that tended to confirm F.M.'s distress and deterioration of her ability to function, I would affirm the judgment of the trial court.
NOTES
[1] Although the ninety-day period has expired, F.M.'s challenge to the sufficiency of the evidence to support her commitment is not moot. See Johnstone v. State, 22 S.W.3d 408, 409 n. 1 (Tex.2000) (per curiam).
[2] Although Dr. O'Boyle testified that his main concern was F.M.'s refusal to submit to a radiation treatment, on cross-examination, he testified that he did not know if Austin State Hospital had the capabilities to provide F.M. with radiation treatment. Thus, it is not clear why Dr. O'Boyle changed his commitment recommendation to the Austin State Hospital where F.M. might not have had any opportunity for the treatment.
[3] The First Court of Appeals in Houston, and the San Antonio, Corpus Christi and Tyler Courts of Appeals have held that refusal to take medication is not an overt act or continuing pattern of behavior sufficient to meet the clear and convincing standard under the Texas Health and Safety Code. See J.M. v. State, 178 S.W.3d 185, 194 (Tex.App.-Houston [1st Dist.] 2005, no pet. h.) (holding that the refusal to take medication is not evidence of an overt act or continuing pattern of behavior); In re Breeden, 4 S.W.3d 782, 789-90 (Tex.App.-San Antonio 1999, no pet.) (finding refusal to take psychiatric medication was not evidence of an overt act under the third criterion, but not addressing whether the refusal to take medication was evidence of an overt act under the first criterion); Broussard v. State, 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no writ) (finding repeated refusal to take psychiatric medication was evidence that patient could not make a rational and informed decision regarding treatment, but was not evidence showing an overt act or continuing pattern of behavior); In re B.S., No. 12-02-00217-CV, 2003 WL 21260028, at *5 (Tex.App.-Tyler 2003, no pet.) (not designated for publication) (finding patient's refusal to take medication for hypertension was not an overt act as contemplated by the Texas Health and Safety Code).

The Amarillo and Dallas Courts of Appeals have discussed the refusal to take medication in the context of the third criterion of commitment, but have not specified whether the refusal could be considered evidence of an overt act or continuing pattern of behavior. See In re K.D.C., 78 S.W.3d 543, 550 (Tex.App.-Amarillo 2002, no pet.) (finding no evidence of an overt act when patient refused medication out of a concern she was pregnant despite the fact that patient knew she previously had a hysterectomy); D.J. v. State, 59 S.W.3d 352, 356 (Tex.App.Dallas 2001, no pet.) (finding no evidence of an overt act when evidence concerning patient's refusal to take medication was "confused at best").
The Fort Worth Court of Appeals has found that refusal to take medication is evidence that "as a whole, `tends to confirm' the likelihood of serious harm ... as well as the deterioration of his [the proposed patient's] ability to function,' but has not held that the refusal to take medication is an overt act or continuing pattern of behavior. Roland v. State, 989 S.W.2d 797, 802 (Tex.App.-Fort Worth 1999, no pet.); see Matter of R.S.C., 921 S.W.2d 506, 509-12 (Tex.App.-Fort Worth 1996, no writ) (holding that the "totality of the evidence" regarding a patient's bizarre delusional system tended to confirm the proposed patient's likelihood to cause serious harm and tended to confirm the proposed patient's distress, inability to function, and inability to make a rational treatment decision).
[4] Two certificates of mental examination for mental illness are required to support an application for court-ordered mental health services. TEX HEALTH & SAFETY CODE ANN § 574.009(a) (Vernon 2003). In this case, certificates were filed by Drs. James Given and Michael O'Boyle of UTMB. Both cited the patient's irritability and refusal to take medication as the basis for commitment.
[5] When Johnson was decided in 1985, the third criterion for commitment under the Texas Mental Health Code required proof that a person "will, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress and will continue to experience deterioration of his ability to function independently and is unable to make a rational and informed decision as to whether or not to submit to treatment." Johnson, 693 S.W.2d at 562 (citing TEX.REV.CIV. STAT. ANN art. 5547-1 et seq. (Vernon Supp.1985)). The most recent revisions in 1997 included the additional requirement that the deterioration of the proposed patient's ability to function must be exhibited by an "inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health or safety." Tex. H.B. 1039, 75th Leg., R.S. (1997). The House Committee on Public Health described the background for the 1997 revisions as follows:

In 1983, the Texas Mental Health Code was rewritten to set up a mental illness commitment standard that required one of three alternative grounds as basis for the imposition of courtordered (sic) mental health services. To order commitment, a mental health court has to find, by clear and convincing evidence, that a mentally ill person is likely to cause serious harm to self or others or must be in such a deteriorated condition as to be considered "dangerous." The lack of guidelines for the court when requiring out-patient services and lack of clarity as to the meaning of the language in the deterioration may allow in-patient commitment of mentally ill persons who are not dangerous. Thus, the current commitment procedure structure has been criticized for causing persons to be placed into in-patient settings when out-patient treatment would be more appropriate.
HOUSE COMM. ON PUBLIC HEALTH, BILL. ANALYSIS, Tex. H.B. 1039, 75th Leg., R.S. (1997).
[6] In light of our holding, it is unnecessary to address appellant's second issue regarding factual insufficiency.
[1] See TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(1), (a)(2)(C) (Vernon 2003).