

# IN THE
# TENTH COURT OF APPEALS

_____

## No. 10-12-00356-CV

## IN RE M.W.A.

_____

## From the County Court at Law No. 2
## Johnson County, Texas
## Trial Court No. F201200047

## MEMORANDUM  OPINION

Appellant M.W.A. appeals from a judgment of involuntary commitment for in-patient mental-health services for a period not to exceed ninety days and an order to administer psychoactive medication.  We will affirm.

### Sufficiency of the Evidence

In his first issue, M.W.A. contends that the evidence is legally and factually insufficient to support the order for temporary mental health services.

The burden of proof for an involuntary commitment is clear and convincing evidence.  TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (West 2010).  Clear and convincing evidence is that "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). And, because the State's burden of proof is clear and convincing evidence, we apply a heightened standard of review. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In reviewing a legal-sufficiency claim, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). When reviewing a factual-sufficiency claim, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a factfinder could reasonably form a firm conviction or belief that the allegations in the petition were proven. *Id.*

Section 574.034(a) of the Health and Safety Code provides that a trial court may order temporary inpatient mental-health services if it finds by clear and convincing evidence that the proposed patient is mentally ill and at least one of three criteria results from that mental illness. TEX. HEALTH & SAFETY CODE ANN. § 574.034(a). Two of the alternative criteria are that the proposed patient is likely to cause serious harm to himself or others. *Id.* § 574.034(a)(2)(A)-(B). The third alternative criterion requires clear and convincing evidence that: (1) the proposed patient is suffering severe and abnormal mental, emotional, or physical distress; (2) his mental or physical deterioration impacts his ability to function independently, "which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for [his] basic needs, including food, clothing, health, or safety"; and (3) he is unable to make rational

and informed decisions as to whether or not to submit to treatment. *Id.* § 574.034(a)(2)(C).

For the State to satisfy its burden of clear and convincing evidence, section 574.034(d) further provides that the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function. *Id.* § 574.034(d). The recent overt act or continuing pattern of behavior must relate to the criterion on which the judgment is based. *In re F.M.*, 183 S.W.3d 489, 492 (Tex. App.—Houston [14th Dist.] 2005, no pet.). The expert's opinions and recommendations must be supported by a showing of the factual bases on which they are grounded. *T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.—Dallas 1999, no pet.).

Here, the order for temporary mental health services states that, based on the verdict of the jury, M.W.A. is mentally ill, and as a result of that mental illness, all three statutory criteria were satisfied: (1) M.W.A. was likely to cause serious harm to himself; (2) M.W.A. was likely to cause serious harm to others; and (3) M.W.A. was suffering severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. In challenging the legal and factual sufficiency of the evidence to support this order,

M.W.A. specifically argues that the State did not present evidence of a recent overt act or a continuing pattern of behavior tending to confirm either the likelihood of serious harm to himself or others or his distress and the deterioration of his ability to function.

The evidence presented was as follows: Becky Phillips, the mental health continuity of care coordinator for Pecan Valley Behavioral Centers in Johnson County, testified that she has known M.W.A. since 1998 and that he has received public mental health services related to his schizophrenia diagnosis since that time. He has been hospitalized several times at public facilities: at Austin State Hospital in 2001 and 2003 and at the Mental Health State Hospital in Virginia in 2009. He has also had multiple hospitalizations in private facilities.

In July 2012, Congressman Bill Flores's secretary called Phillips and told her that M.W.A. had been calling their office requesting financial assistance. Phillips contacted M.W.A. and began assisting him in finding temporary housing, food, and clothing. M.W.A. has a fixed income of around $672 a month, on which some patients live very comfortably, but M.W.A. would usually rent a motel room, exhaust his finances by the middle of the month, and then begin calling others for help to find a place to stay.[1] Phillips had him listed in her records as homeless.

Phillips testified that M.W.A. suffers from extreme paranoia due to his schizophrenia and that it was very obvious when she contacted him that July that the paranoia was driving a lot of his decisions. M.W.A.'s paranoia leads him to believe that

---

[1] The only family of M.W.A.'s that Phillips had any contact with was a brother who lived in Grandview, but M.W.A. was unhappy staying with him.

he is frequently being chemically poisoned, which makes providing services for him very difficult. For instance, M.W.A. insisted that, at the motel where Phillips placed him, everything they sprayed or used to clean his room was attacking him physically. Phillips also spoke to the Adult Protective Services case manager in Johnson County, who told Phillips that she had probably placed M.W.A. in as many as ten different residential settings, including apartments, nursing homes, and assisted living facilities, but that he had either walked off or sabotaged all of those settings.

Phillips was also confronted with M.W.A.'s inability to take care of himself on a daily basis. Phillips stated that it is "real obvious" that M.W.A. does not bathe on a regular basis. He has food stamps but eats only what he can heat up in the microwave and frequently believes that his food may be poisoned. Although he would have access to medication because he has Medicaid, he will not take psychiatric medication. Moreover, M.W.A. has a religiosity delusion that has been going on for quite a while. M.W.A. often refers to himself as Jesus and has talked to Phillips about getting messages from "a power bigger than the rest of us," a power that may be what some people refer to as God. Phillips has not heard M.W.A. directly threaten himself or someone else, but she did hear him say that "there are powers beyond all of us that are going to take care of all of us who are not taking care of him." The case manager also told Phillips that while he had an apartment in Keene, M.W.A. was arrested for attacking a neighbor because she was wearing perfume.

The State introduced, through Phillips, a Physician's Certificate of Medical Examination for Mental Illness (CME) prepared by Dr. Sejal Mehta and Dr. Gary

Malone, respectively. First, Dr. Mehta's CME stated that he evaluated and examined M.W.A. on August 10, 2012. Dr. Mehta reported that, during the examination, M.W.A. said that the government had put "chips" in him and was following him around and that the air has cyanide in it and "they are planning to kill me but I will kill them before that." Additionally, Dr. Mehta explained that M.W.A. committed the following acts: refused medications; acted aggressively and threateningly; talked about nuclear waste; made nonsensical statements; and made threats to kill. Dr. Mehta thus stated that M.W.A.'s Mental Status examination revealed that he was paranoid and delusional, aggressive toward people, threatening his case worker, and experiencing homicidal ideation. And, based on the foregoing, Dr. Mehta opined that M.W.A. was mentally ill (schizophrenia-paranoid), and that as a result of that illness M.W.A. was likely to cause serious harm to himself; was likely to cause serious harm to others; and

> [was] suffering severe and abnormal mental, emotional, or physical distress; [was] experiencing substantial mental or physical deterioration of his ability to function independently, which [was] exhibited by [his] inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and, [was] unable to make a rational and informed decision as to whether or not to submit to treatment.

Dr. Mehta further opined that M.W.A. presented a substantial risk of serious harm to himself or others if not immediately restrained and that emergency detention was the least restrictive means by which the necessary restraint might be accomplished, which was demonstrated by M.W.A.'s behavior, as well as evidence of severe emotional distress and deterioration in his mental condition to the extent that he could not remain at liberty.

Dr. Malone's CME stated that he evaluated and examined M.W.A. on August 13, 2012. Dr. Malone reported that M.W.A. said that "they" were trying to hurt him and that the medicine was poison. Dr. Malone also stated that M.W.A. was refusing treatment, not eating, and not bathing. Based on the foregoing, Dr. Malone opined that M.W.A. was mentally ill (schizophrenia), and that as a result of that illness M.W.A.

> [was] suffering severe and abnormal mental, emotional, or physical distress; [was] experiencing substantial mental or physical deterioration of his ability to function independently, which [was] exhibited by [his] inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and, [was] unable to make a rational and informed decision as to whether or not to submit to treatment.

Dr. Malone also further opined that M.W.A. presented a substantial risk of serious harm to himself or others if not immediately restrained and that emergency detention was the least restrictive means by which the necessary restraint might be accomplished, which was demonstrated by M.W.A.'s behavior, as well as evidence of severe emotional distress and deterioration in his mental condition to the extent that he could not remain at liberty.

Phillips testified that the physicians' CMEs matched up with what she was seeing and what she had in her file regarding M.W.A. On August 14, 2012, the trial court ordered M.W.A. to be taken to North Texas State Hospital. When Phillips visited him there the week before trial, M.W.A. told her that they had mopped the floor, that it had soaked through his shoes and into his feet, and that he was being poisoned by the bleach. Phillips concluded that M.W.A. was more paranoid now than he had been in the past and that if he did not get the treatment and medication he needs, his

deterioration would become more extreme. Phillips stated that treatment on an outpatient basis would not work for M.W.A. because he has the legal right to refuse treatment and medication and services, but his continued exercise of the right would only end up in his demise. Phillips said that as long as M.W.A. was not medicated, he would not be making rational decisions that would allow him to be treated in a less restrictive outpatient residential setting.

Vince Vogt, M.W.A.'s assigned social worker at North Texas State Hospital, then testified that since first seeing him, M.W.A. had been gradually declining. At the time of trial, M.W.A. was not taking care of his basic needs by himself. M.W.A. had not been bathing on a regular basis, and he quite often wore the same clothing. Vogt attributed this behavior to M.W.A.'s mental illness. Vogt stated that he did not think M.W.A. would get better on his own. Nor did Vogt think M.W.A. could be treated on an outpatient basis until his mental state improved. Instead, Vogt thought M.W.A. needed a 90-day treatment period, with medication, to start getting better.

Dr. Zahida Syed, M.W.A.'s treating physician at North Texas State Hospital, then testified that she first examined M.W.A. on August 15, 2012. At that time, Dr. Syed found M.W.A. to be very paranoid. He was having delusions about being poisoned by different chemicals, fumes, and detergents. He was also having delusions about having various medical problems like mesothelioma, melanoma, and bone cancer; about having a chip in his brain; about having a metal piece in his throat that prevented him from swallowing; about needing 24-hour oxygen; and about needing the assistance of an electric wheelchair. The medical doctors had examined M.W.A. and found his only

ailment to be eczema, for which they prescribed a steroid cream. Dr. Syed diagnosed M.W.A. as having "schizophrenia, paranoid type."

Since M.W.A.'s admission to North Texas State Hospital, Dr. Syed had been seeing him twice per week, as well as receiving reports on him every morning. Dr. Syed stated that when she saw M.W.A., the main thing he wanted was to be released. Dr. Syed said that although M.W.A. never made a direct threat or was physically aggressive, he would get very agitated and irritable. He had said, "[I]t's going to be in the best interest for you if you are going to release me." He also told a woman, "I don't mind killing. I can kill."

M.W.A. was refusing any type of treatment at the hospital. Dr. Syed said that M.W.A. believes he cannot swallow medication because he has a metal piece in his throat. Dr. Syed offered M.W.A. alternatives to swallowing the medication, such as injecting the medication or allowing it to dissolve in the mouth, but he still refused.

M.W.A.'s hygiene in the hospital has also been very poor. Although the hospital has made several concessions for him, M.W.A. is reluctant to take showers. Dr. Syed stated that she is also worried about M.W.A.'s unwillingness to eat properly. Dr. Syed said that M.W.A. misses meals, and when he does eat, he only eats twenty to forty percent of the meal. Dr. Syed testified that, for him, losing weight could be dangerous because he only weighs about 100 pounds. She believes that if he is not hospitalized for a period up to ninety days, he will continue to deteriorate.

Dr. Syed's CME that she prepared on September 7, 2012 was admitted into evidence. In it, she opined that M.W.A. was mentally ill (schizophrenia, paranoid type), and as a result of that illness, M.W.A.

> [was] suffering severe and abnormal mental, emotional or physical distress; experiencing substantial mental or physical deterioration of his[] ability to function independently, which [was] exhibited by [his] inability, except for reasons of indigence, to provide for [his] needs, including food, clothing, health, or safety and not able to make a rational and informed decision as to whether to submit to treatment.

As the basis for her opinion, Dr. Syed detailed her observations of M.W.A. as explained above. Dr. Syed also stated that she opined that M.W.A. presented a substantial risk of serious harm to himself or others if not immediately restrained, which was demonstrated by his behavior and by evidence of severe emotional distress and deterioration in his mental condition to the extent that he cannot remain at liberty.

The State also introduced, through Dr. Syed, the CME of Dr. Peter George Faden. Dr. Faden's CME states that he evaluated and examined M.W.A. on September 7, 2012. He opined that M.W.A. was mentally ill (schizophrenia, paranoid type), and as a result of that illness, M.W.A.

> [was] suffering severe and abnormal mental, emotional or physical distress; experiencing substantial mental or physical deterioration of his[] ability to function independently, which [was] exhibited by [his] inability, except for reasons of indigence, to provide for [his] needs, including food, clothing, health, or safety and not able to make a rational and informed decision as to whether to submit to treatment.

Dr. Faden detailed the basis for the opinion as follows:

> Pt. severly [sic] psychotic with delusional thought. He is not able to satisfy basic needs and is endangering himself. Pt. not bathing had developed a rash that could lead to infections. Pt. had been living in a tent

for several months. The local MHMR arranged trial placement at a motel and offered medications for his symptoms of psychosis. He would not participate in treatment and fled the motel due to fears of being poisoned.

M.W.A. testified on his own behalf and stated that he did not feel like he needed medication and he did not wish to harm himself or others.

Based on our review of the evidence, we conclude that the State presented clear and convincing evidence such that a reasonable factfinder could form a firm belief or conviction that M.W.A. has engaged in a recent overt act or a continuing pattern of behavior that tends to confirm his distress and the deterioration of his ability to function.[2] First, the State presented evidence of M.W.A.'s continued inability to maintain housing because of his paranoia and delusions that he is being chemically poisoned. Similarly, the State presented evidence that M.W.A. eats very little because of his delusional belief that the food is poisoned. And Dr. Syed testified that, for him, losing weight could be dangerous because he only weighs about 100 pounds. Furthermore, the State presented evidence that because of his mental state, M.W.A. bathes infrequently, which has caused him to have eczema.

The State also presented evidence that despite M.W.A.'s distress and the deterioration of his ability to function, M.W.A. refuses to submit to treatment. Dr. Syed testified that M.W.A. believes he cannot take medication because he has a metal piece in his throat that prevents him from swallowing. Accordingly, we hold that the evidence

---

[2] We thus need not decide whether the State presented clear and convincing evidence such that a reasonable factfinder could form a firm belief or conviction that M.W.A. has engaged in a recent overt act or a continuing pattern of behavior that tends to confirm the likelihood of serious harm to himself or others.

supporting the trial court judgment for temporary in-patient mental-health services is legally and factually sufficient. We overrule M.W.A.'s first issue.

## Failure to Conduct Hearing

In his second issue, M.W.A. contends that the trial court abused its discretion in ordering that he should be administered psychoactive medication without first conducting a hearing in compliance with section 574.106 of the Health and Safety Code.

At the end of the temporary commitment hearing in this case, the trial judge stated, "The Court has before it Order for Temporary Inpatient Mental Health Services and Order for Customary Administration of Psychoactive Medications. Which the Court -- is there any objections to this?" The State and defense both responded, "No." The trial court then signed both orders.

For a complaint to be preserved for appeal, the record must show that the appellant made a timely request, objection, or motion. TEX. R. APP. P. 33.1(a)(1). M.W.A., through his counsel, never complained that he was entitled to a separate hearing regarding the administration of psychoactive medication and in fact voiced that he had no objection to the order; therefore, he failed to preserve his complaint for review. *See id.*; *Boufaissal v. Boufaissal*, 251 S.W.3d 160, 162 (Tex. App.—Dallas 2008, no pet.) ("a party will not be allowed to complain on appeal of an action or ruling which she invited or induced"). We overrule M.W.A.'s second issue.

Having overruled both of M.W.A.'s issues, we affirm the trial court's judgment of involuntary commitment for in-patient mental-health services for a period not to exceed ninety days and the order to administer psychoactive medication.

REX D. DAVIS
Justice

Before Chief Justice Gray,
 Justice Davis, and
 Justice Scoggins
 (Chief Justice Gray concurring with a note)*
Affirmed
Opinion delivered and filed April 18, 2013
[CV06]

\*   (Chief Justice Gray concurs.  A separate opinion will not issue.)