Affirmed and Opinion filed June 24, 2008








Affirmed and Opinion filed June 24, 2008.

 

 

In The

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00306-CV

____________

 

MARLIN DEANDRE HOUSE, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 208th
District Court

Harris County, Texas

Trial Court Cause No. 739,579

 



 

O P I N I O N

Appellant, Marlin Deandre House, appeals from an order
extending his involuntary inpatient mental health treatment for a period of one
year.  In two issues, appellant challenges the legal and factual sufficiency of
the evidence to support the order.  We affirm.

I.  Background








On December 6, 1996, appellant killed his mother by
stabbing her with a knife at least ninety‑three times.  Appellant was
indicted for murder, but after a bench trial, the trial court found him not
guilty by reason of insanity.  The court subsequently ordered him committed to
a state mental hospital and has recommitted him annually since 1998.  Last
year, this court considered the trial court=s 2005 order of
recommitment and reversed, effectively ordering appellant released to
outpatient care.  House v. State, 222 S.W.3d 497, 508 (Tex. App.CHouston [14th
Dist.] 2007, pet. denied).  During the pendency of the State=s petition for
review in that case, the trial court held a new hearing and issued the March
30, 2007 recommitment order currently before us.  In our prior opinion, we held
that the evidence was legally insufficient to support the order.  Id. at
507.  We based our decision largely on deficiencies with the report and
testimony of the State=s expert and the lack of evidence in the
record that appellant had committed a recent overt act or exhibited a
continuing pattern of behavior as contemplated by the controlling statutes.  Id.
at 504-07.  Distinguishing the present appeal from the prior proceedings is the
fact that (1) the State=s expert testified with greater
specificity in the trial court in the most recent recommitment hearing, and (2)
in the year between hearings, appellant suffered a rapid decompensation episode
when his medication was changed.  Also, during that intervening year, appellant
refused his medication at one point and reported hearing voices.  We will begin
by discussing the standards governing our review; we will then analyze the
record in light of these standards.[1]

II.  Standards of Review








Under former article 46.03 of the Texas Code of Criminal
Procedure, which is applicable to this case by virtue of the date of the
offense, recommitment hearings for persons found not guilty by reason of
insanity must be conducted pursuant to the Texas Mental Health Code.  See
Act of May 25, 1983, 68th Leg., R.S., ch. 454, 1983 Tex. Gen. Laws 2640, 2644‑46
(repealed 2005) (current version at Tex. Crim. Proc. Code Ann. art. 46C.261
(Vernon Supp.2006)).  Under section 574.066 of the Mental Health Code, a court
may renew an order for inpatient mental health services if it finds that the
patient meets the criteria for involuntary commitment set forth in section
574.035(a) of the Mental Health Code.  Tex. Health & Safety Code Ann. ' 574.066(f) (Vernon
2003) (specifying the procedure for the renewal of an order for extended mental
health services).

Section 574.035(a) provides that a court may order extended
inpatient mental health services if the trier of fact finds, by clear and
convincing evidence, that, among other requirements, the proposed patient meets
the following criteria:

(1) the proposed patient is mentally ill;  and

(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others;  or

(C) is:

(i) suffering severe and abnormal mental, emotional, or physical
distress;

(ii) experiencing substantial mental or physical deterioration of the
proposed patient=s ability to function
independently, which is exhibited by the proposed patient=s inability, except for reasons of
indigence, to provide for the proposed patient=s basic needs, including food, clothing, health, or
safety;  and

(iii) unable to make a rational and
informed decision as to whether or not to submit to treatment.

Id. ' 574.035(a)
(Vernon 2003).  The trial court must specify which of the criteria under
subsection (a)(2) forms the basis for the recommitment.  Id. ' 574.035(c).








In order to be clear and convincing under section
574.035(a), the evidence must include expert testimony and, unless waived,
evidence of a recent overt act or a continuing pattern of behavior that tends
to confirm (1) the likelihood of serious harm to the proposed patient or
others, or (2) the proposed patient=s distress and the
deterioration of the proposed patient=s ability to
function.  Id. ' 574.035(e).  The court cannot make its
findings solely from certificates of examination for mental illness but shall Ahear testimony.@ Id. ' 574.035(g). 
Furthermore, the trial court may not enter an order for extended mental health
services unless appropriate findings are made and are supported by testimony
taken at the hearing.  Id.  The testimony must include competent medical
or psychiatric testimony.  Id.

When the burden of proof is heightened to a clear‑and‑convincing
standard, the sufficiency of the evidence standards of review are also
heightened.  In re F.M., 183 S.W.3d 489, 492 (Tex. App.CHouston [14th
Dist.] 2005, no pet.).  In conducting a legal sufficiency review when the
burden is clear‑and‑convincing, the reviewing court must consider
all the evidence in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed a firm belief or
conviction as to the truth of the allegations sought to be established.  In
re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002); State v. Addington, 588
S.W.2d 569, 570 (Tex. 1979).  In conducting a factual sufficiency review in
this context, the reviewing court gives due consideration to evidence that the
factfinder reasonably could have found to be clear and convincing.  In re
J.F.C., 96 S.W.3d at 266.  The ultimate inquiry is whether a reasonable
factfinder could have resolved disputed evidence in favor of the finding.  Id. 
The reviewing court must avoid supplanting it=s own judgment in
place of the factfinder=s judgment.  In re H.R.M., 209
S.W.3d 105, 108 (Tex. 2006).

III.  Evidence

The case below was a typical battle of experts.  Testifying
in support of appellant=s recommitment, the State=s expert,
psychiatrist Mark Moeller, testified that he reviewed appellant=s medical records
and the offense report and interviewed appellant for A[p]robably a
little over an hour.@  He opined that appellant suffers from
paranoid schizophrenia and requires inpatient treatment because he presents Aa fairly high
level of future dangerousness.@  He stated that appellant has an
elementary understanding of his illness and understands Athat his bizarre
thoughts led directly to [his mother=s death].@








Moeller expressed concern about appellant=s Aability to
decompensate or recompensate@ because of an incident that occurred in
February 2007.  One of appellant=s medications was
changed, apparently because the original medication caused weight gain. 
According to Moeller, appellant rapidly and severely decompensated to the point
of requiring forced medication.  Moeller described the incident as Aa pretty bad
situation . . . even inside of a locked unit with all the doctors and nurses
around.@  Appellant became
very anxious, began rocking, and had problems breathing.  He also screamed,
otherwise talked loudly and repeated himself, and produced A[l]oud
caterwauling,@ which Moeller defined as Aanimal-like
sounds.@  Appellant also
refused his nighttime medications.  Although Moeller could not specifically
identify the rejected medications, he said the troubling thing was that
appellant refused the medications not the exact nature of those medications. 
Once appellant was put back on his original medication, it took him several
weeks to return to his normal condition.  Moeller further stated that during
the decompensation episode, appellant reported hearing voices speaking directly
to him from a television.  Moeller found the report of auditory hallucinations
to be particularly troubling because appellant was experiencing similar
problems at the time that he killed his mother.  Moeller additionally
referenced a prior incident in which appellant avoided taking his medication by
Acheeking@ it, or hiding it
in his cheek until he could discard it.  Moeller also mentioned that records
showed appellant consumed alcohol while an inpatient in 2002.  Moeller
explained that Atypically patients decompensate fairly
rapidly and fairly aggressively when they start using other substances in
addition to their prescribed medication.@  Moeller further
noted that appellant also suffered a severe decompensation episode in 2003 when
he did not receive his medications.








Moeller opined that if released, appellant would be in
imminent danger of hurting himself and others.  He said that if appellant
stopped taking his medications, he would decompensate even more rapidly than he
had when his medication was simply changed.  Moeller said that if appellant
decompensated after release, he could be a danger to other people because
during the prior decompensation episode, appellant became grossly psychotic,
heard voices, and refused medication.  Moeller said that this was the same type
of behavior appellant exhibited when he attacked his mother.  Moeller explained
that some patients take a long time to exhibit symptoms when they discontinue
their medications, but appellant demonstrated a propensity for rapid
decompensation probably because of the severity of his illness.  Moeller said
that appellant=s propensity to rapidly decompensate meant that he was
likely to be a danger if released.

Moeller specifically asserted that appellant is suffering
from severe and abnormal mental, emotional, and physical distress, Abased on his
history and what he has to live with from his [sic] incident and also where he
lives now.@  Moeller further opined that appellant has
experienced severe mental or physical deterioration of his ability to function
independently outside of a mental hospital.  He based this opinion on the fact
appellant has been monitored and taken care of since 1996 and thus would no
longer possess certain skills, which would make it overwhelming for him to
leave the hospital.  Moeller expressed concern about appellant=s refusal to
permit contact with his family, despite requests from the family for such
contact.  Moeller said that when he discussed this with appellant, appellant
said he preferred to not involve them and then refused to elaborate.  Moeller
said this constituted Aunfinished business@ for appellant,
and it concerned Moeller that it might be Apart of his
underlying paranoia.@

Moeller further opined that whether appellant was able to
make a rational decision regarding submitting to treatment changed from
day-to-day and that appellant could Avery easily slide
and start refusing treatment.@  In fact, according to Moeller, appellant
did refuse treatment in February 2007 when he refused his medication.  Moeller
also based this assessment on notes by appellant=s treatment team
suggesting he continued to deny understanding the reasons for his admission to
the State hospital and the fact he refused to sign releases to permit family
contact.








Moeller acknowledged that he could not point to anything
specific occurring after the date of the prior recommitment order that
demonstrated appellant would harm himself or someone else.  He did, however,
testify that appellant=s mental illness was exhibited in a
continuing pattern of behavior.  He said that appellant=s paranoid
ideation likely resulted in his refusal to sign releases allowing contact with
his family.  Moeller also identified other continuing symptoms of appellant=s paranoid
schizophrenia, including social withdrawal and an oddness in his speech and his
perceptions.  When asked under what circumstances appellant could safely be
released, Moeller suggested that if appellant was successfully placed on a
longer-acting injected medication and then placed under very capable
surveillance, he might safely be released.

Jerome Brown, a clinical psychologist, testified in support
of appellant=s release.  He first evaluated appellant=s condition in
2000 and did so again in March 2007.  For the most recent evaluations, Brown
interviewed appellant for about an hour and a half and reviewed appellant=s medical
records.  Brown stated that appellant suffers from paranoid schizophrenia, but
he disagreed with Moeller=s opinion that appellant was likely to
harm himself or others because of his rapid and severe decompensation.  Brown
opined that it was Aprofessionally unacceptable@ to Ajudge [appellant]
on the basis of a single episode.@  He said that a
patient needed to exhibit a pattern of behavior before such a conclusion could
be reached.  He further stated that while appellant did Abecome sicker@ as a result of
the change in his medication, he did not become dangerous.  Brown described the
decompensation episode as moderate to severe and emphasized that during it,
appellant did not deteriorate to anywhere near the level that he had reached
when he assaulted his mother.  Brown agreed that had appellant stopped taking
medication altogether, the episode would probably have been worse, although it
was unclear whether he would have become violent.  While Brown acknowledged
concern that appellant refused medication during the decompensation episode, he
pointed out that appellant=s judgment had deteriorated at that point
because of the decompensation.








Brown said that he understood the record references
regarding appellant=s hearing voices from the television to be
historical in nature and not a statement that appellant heard voices during the
most recent decompensation episode.  However, Brown acknowledged that appellant
reported hearing voices within the year before the interview, only not from the
television.  Also during their interview, appellant expressed to Brown that he
understood the importance of telling a doctor if he began to hear voices.  Appellant
also said he understood that the medications prevented his hallucinations. 
Based in part on these representations, Brown concluded that appellant=s awareness of his
illness was Aabout as good as you can expect,@ which is to say a
workable, practical knowledge but not a sophisticated one.  Appellant also
exhibited a working knowledge of how his transition to release would work and
an understanding that he would need to take medication for the rest of his
life.

Regarding appellant=s refusal to sign
release forms for family contact, Brown stated that there could be other
reasons beyond paranoid ideation for the refusal.  Appellant told Brown that he
didn=t want to bother
or burden his family but that he actually had been in contact with them.  When
asked whether there was any evidence of a recent overt act that showed
appellant was likely to be dangerous, Brown responded:  ANo, not that he=s spontaneously or
independently exhibited, no.@  When asked if appellant was likely to be
a danger if released, Brown said:  AI don=t think he
represents any danger on the basis of what we can reasonably expect from his
current status and his current behavior.  As we see him today, I don=t think this man
represents a danger to anyone.@  Brown additionally stated that there was
Alittle or nothing
left that [appellant] could do to better . . . make himself more acceptable for
release.@  He blamed
appellant=s decompensation episode on what he termed doctors= Ainterventions,@ but acknowledged
that there was no way to prevent such interventions if appellant were treated
on an out-patient basis.








Debra Osterman, a psychiatrist with the Mental Health and
Mental Retardation Authority (MHMRA) of Harris County, also testified in
support of appellant=s release.  She stated that she has been
treating appellant intermittently for over ten years.  She said that it was
initially difficult to get him stabilized, and he had a couple of early
decompensation episodes when he stopped taking his medications.  However, she
said that since the early period, he has done remarkably well.  Appellant has
even been given Agreen card privileges@ at the hospital,
which affords him a significant degree of freedom of movement within the facility
grounds.  This led to one instance about three years before when appellant
walked off the grounds to get a hamburger and then walked back.  Osterman was
unconcerned by this conduct because she said that a less trustworthy patient
could have obtained Aall sorts of harmful items@ under such
circumstances.

Osterman further testified that in February 2007, appellant
asked about having his medication changed because it was causing him to gain
weight.  Osterman approved the change beginning on February 5, and appellant
thereafter decompensated.  Osterman blamed herself for the episode becoming as
severe as it did; she went out of town for several days immediately after
changing appellant=s prescription.  She said that the episode
did not alarm her and did not cause her to conclude that appellant was likely
to harm himself or anyone else.  She said that the mere fact that appellant was
screaming during the episode did not alarm her absent suicidal or homicidal
threats.  Osterman categorized the incident as moderate to severe and opined
that it was better for a patient to decompensate rapidly because the change
would then be readily noticed and reported.

Osterman further clarified her notes in appellant=s medical history
regarding auditory hallucinations around the time of the decompensation episode
by saying that the notes were historical only and not a report of new
hallucinations.  She also stated that she Atend[ed] to think@ that appellant=s refusal to
authorize contact with his family was not a symptom of paranoia.  Osterman
concluded that appellant=s symptoms were typical for paranoid
schizophrenia and that most people with that disorder are not dangerous to
themselves or others.








David Tristan, a rehabilitation clinician and court
resource coordinator for MHMRA, testified regarding the outpatient facilities
and services that would be available to appellant upon his release.  Tristan
stated that there is one independent living residence, Northline SRO (Asingle resident
occupants@), that was available to appellant.  At this facility,
residents have their own rooms and are expected to take care of themselves.  He
said that they have management staff at that location and that the New Start
program offered Adaily group outpatient psycho-social
treatment@ that appellant would be eligible to attend. 
Appellant could also see a doctor associated with that program once or twice a
month as needed.  He would have both a service coordinator, who would monitor
him and refer him to appropriate services, and a counselor, who would conduct
group or individual sessions as required.  Tristan also explained that the
court could craft highly specific orders dictating the terms and conditions of
release, particularly in regard to treatment and the action to be taken in the
event appellant violated the conditions.  Tristan stated that the Northline SRO
facility was able to monitor medicine intake during weekdays but not on
weekends; he was unsure whether they would monitor intake at night.  He further
said that while the New Start program always had someone on call if the court
wanted to designate contact with appellant during weekends, Northline SRO
itself did not monitor residents.

The record also contains a letter to the court from C.G.
Plyler, a psychiatrist at Rusk State Hospital, supporting appellant=s release.  In the
letter, Plyler states that appellant has responded well to medication and has
been Acompletely
cooperative and compliant@ with treatment in his present stint at
the hospital.  Plyler concludes that appellant Ahas achieved a
level of insight somewhat rare in this condition that will serve to protect him
from the dangerous reality distortions he has suffered in the past and he seems
determined to continue in psychiatric care to ensure that eventuality.@

IV.  Legal Sufficiency








In his first issue, appellant argues that the evidence is
legally insufficient to support the trial court=s recommitment
order.  To support appellant=s recommitment, there must be clear and
convincing evidence in the record to demonstrate that appellant is mentally ill
and as a result he either (1) is likely to cause serious harm to himself; (2)
is likely to cause serious harm to others; or (3) is (a) suffering severe and
abnormal mental, emotional, or physical distress; (b) experiencing substantial
mental or physical deterioration of his ability to function independently, and
(c) unable to make a rational and informed decision as to whether or not to
submit to treatment.  Tex. Health & Safety Code Ann. ' 574.035(a).  We
first note that it is undisputed that appellant remains mentally ill, thus
fulfilling the initial requirement for commitment under section 574.035(a). 
Although the trial court did not make express written findings regarding which
of the secondary criteria it relied on in ordering recommitment, the parties
focus their arguments on the first two, debating whether the evidence shows appellant
is likely to cause serious harm to himself or others.[2] 
As set forth above, in order to be clear and convincing regarding dangerousness
to self or others, the record must include evidence of a recent overt act or a
continuing pattern of behavior that tends to confirm the likelihood of serious
harm to the patient or others.  See id. ' 574.035(e); Martin
v. State, 222 S.W.3d 532, 534-35 (Tex. App.CHouston [14th
Dist.] 2007, pet.denied).  We will narrow our analysis further to consider
whether the evidence supports the conclusion that if released, appellant is
likely to cause serious harm to others.[3]








Key support for the conclusion that appellant is likely to
cause serious harm to others comes from evidence that (1) appellant killed his
mother by stabbing her at least 93 times with a knife; (2) appellant refused
medication within the year prior to the recommitment hearing and has previously
Acheeked@ medication to
prevent taking it; (3) appellant has experienced auditory hallucinations within
the year, and such hallucinations were present when appellant violently
attacked his mother; (4) appellant moderately to severely decompensated when
his medication was changed, has had at least one such incident while
hospitalized in the past, and would be likely to decompensate even more severely
if his medication stopped altogether; (5) the facility that has agreed to
receive appellant as a resident does not provide monitoring services; and (6)
if released, appellant would be responsible for administrating his own
medication at times.  Based primarily on these facts, Moeller, the State=s expert,
concluded that appellant presents Aa fairly high
level of future dangerousness.@  Moeller further testified that in his
opinion, appellant=s propensity to rapidly decompensate means
he is likely to be a danger if released.  He opined that appellant could Avery easily slide
and start refusing treatment@ because his ability to make rational
decisions regarding treatment waxed-and-waned.  Moeller additionally
interpreted appellant=s behavior during the decompensation
episode as being similar to the conduct he exhibited when he attacked his
mother.  Moeller also pointed to appellant=s having obtained
and consumed alcohol during his hospitalization, opining that taking alcohol
could cause appellant to decompensate Arapidly@ and Aaggressively.@

Appellant first argues that the evidence does not support
the conclusion that he is likely to stop taking his medication.  We disagree. 
As stated, the evidence shows that appellant refused medication in February
2007 and that he had previously been Acheeking@ medication.[4] 
Furthermore, Moeller expressed serious doubt as to whether appellant would be
capable of consistently staying on his medication given the Awaxing and waning@ of appellant=s understanding of
his condition and the fact that if released, appellant would at times be
responsible for administering his own medicine.  Appellant also points out that
his refusals to take medication have been isolated incidents over a period of
years.  However, the evidence supports the conclusion that it would only take
one such incident for appellant=s condition to deteriorate rapidly and
severely.[5]








Next, appellant argues that even if he stopped taking his
medication, the evidence does not support the conclusion that his outpatient
care givers would fail to detect this fact or fail to notice changes in his
demeanor.  While the record shows that daily contact with care givers could be
arranged, the record also reveals that at times, appellant would be responsible
for his own medication, and the facility where he would be placed if released
does not provide patient monitoring.  Indeed, evidence shows that residents of
that facility have significant autonomy.  Thus, appellant=s failure to take
medication could likely go undetected as could his absence from the premises. 
Additionally, the detailed evidence regarding appellant=s propensity to
rapidly and severely decompensate when his medication intake is inconsistent
(as in a simple change from one medication to another), suggests that it would
not take appellant long to go from seemingly fine to dangerous.  Experts agreed
that appellant=s decompensation would probably be even more severe if
he completely stopped taking his medication.  Based on this evidence, the trial
court would not have been unreasonable in concluding that care givers would
likely not identify appellant=s failure to take medicine in time to
prevent harm to others.

Appellant further suggests that there is no evidence he
would become violent if he stopped taking his medication.  It is undisputed
appellant stabbed his mother to death when his condition was untreated prior to
his commitment.  Moeller stated that several of the symptoms appellant suffered
during his decompensation episode were similar to symptoms he suffered at the
time of the assault on his mother.  This evidence and expert opinion is
sufficient to support the conclusion appellant is likely to become violent if
released.








Appellant cites Broussard v. State, among other
cases, for the propositions that (1) bare expert opinion as to potential
dangers is not sufficient to warrant an individual=s recommitment,
and (2) evidence that an individual is mentally ill and in need of
hospitalization does not without more meet the statutory requirements for
recommitment.  827 S.W.2d 619, 622 (Tex. App.CCorpus Christi
1992, no pet.).  While we do not necessarily disagree with the Broussard
court=s analysis or that
in the other cited cases, it is clear here that Moeller=s opinions
regarding appellant=s dangerousness were well-grounded in the
evidence.[6]

Lastly, appellant emphasizes several portions of the
testimony from Moeller, Brown, and Osterman, including to the effect that
appellant (1) possesses a certain level of understanding concerning his
condition; (2) did not cause his most recent decompensation episode; (3)
understands he needs to tell his doctors if he starts hallucinating; (4) has
been given special Agreen card@ privileges and
has not seriously abused them; and (5) decompensates rapidly thus making it
more likely care givers would notice.  Although each of these points may have
played a role in the trial court=s analysis, we find
that none of them were of such weight as to render Moeller=s testimony
inaccurate or the trial court=s holding unreasonable.








In summary, we find that the evidence regarding appellant=s decompensation
in February 2007 shows a recent overt action that considered in light of
appellant=s medical history, tends to confirm the likelihood of
serious harm to others.  See Tex. Health & Safety Code Ann. ' 574.035(e); House,
222 S.W.3d at 500, 507.  We further find that the facts listed above, taken in
conjunction with Moeller=s expert testimony, support the conclusion
that if released, appellant would likely cause serious harm to others. 
Accordingly, we overrule appellant=s first issue.

V.  Factual Sufficiency

In his second issue, appellant contends that the evidence
is factually insufficient to support the trial court=s recommitment
order.  As stated above, our ultimate inquiry in this context is whether a
reasonable factfinder could have resolved disputed evidence in favor of its
findings.  See In re J.F.C., 96 S.W.3d at 266.  Under this issue,
appellant primarily asserts that the trial court as factfinder could not have
reasonably resolved the discrepancies between the experts= testimonies in
favor of recommitting appellant.  He stresses Osterman=s years of
experience working with appellant and Brown=s experience in
testifying in mental health hearings, while generally attacking Moeller=s testimony as Alacking in
substance [and being] vague . . . circuitous . . . and speculative.@  However, the
trial court, as factfinder and sole judge of the credibility of the witnesses,
was within its discretion in finding the testimony from Moeller to be more
credible than that from Osterman and Brown.  See, e.g., Herbert v. Herbert,
754 S.W.2d 141, 144 (Tex. 1988);  N.N. v. Inst. for Rehab. & Research,
234 S.W.3d 1, 17, 21 (Tex. App.CHouston [1st Dist.] 2006, no pet.).








Appellant additionally argues that the trial judge=s comments during
the hearing demonstrated that she Amisapprehended
several undisputed material facts.@[7]  Specifically,
appellant references the judge=s statements regarding appellant=s Agoing off@ his medication,
decompensating, and becoming aggressive.  Regarding medication, appellant says that
there is no evidence to support the statement that appellant has ever Agone off his
medication,@ but only that a change in his medication caused the
decompensation episode.  However, the judge=s comment was
broad enough to include the fact that appellant did stop taking one medication
when it was replaced by another.  Appellant had in effect Agone off@ the original
medication.  Additionally, the record also supports the conclusion that
appellant, in fact, did refuse his medication during the decompensation
episode.

Regarding the decompensation comment, appellant argues that
decompensating alone is insufficient to support the recommitment order.[8] 
Regardless of the validity of appellant=s argument, it
does not advance appellant=s assertion that the trial judge
misapprehended material facts.  It is undisputed that appellant decompensated
in February 2007.

Lastly, appellant contends that there is no evidence to
support the trial judge=s statement that appellant became aggressive
during the decompensation episode.  We begin by noting that the word Aaggressive@ does not
necessarily suggest violent behavior but means A[i]nclined to . .
. act in a hostile fashion.@  See The Am. Heritage
Dictionary 87 (2d College Ed. 1991).  AHostile@ in turn can be
defined as Aantagonistic.@  Id.  at
624.  There is evidence that during the decompensation episode, appellant
screamed loudly, talked repetitively, refused medication, and produced loud Acaterwauling.@  Under the
circumstances, this conduct could be interpreted as aggressive even though it
was not violent.  Because we find no merit in appellant=s arguments under
this issue, we overrule appellant=s second issue.

We affirm the trial court=s order.

 

 

/s/      Adele Hedges

Chief Justice

 

 

Judgment rendered
and Opinion filed June 24, 2008.

Panel consists of
Chief Justice Hedges and Justices Anderson and Boyce.

 









[1]  Although not raised by the parties, we had some
concern that the reversal of the prior year=s
recommitment order may have rendered the present year=s recommitment proceedings moot.  However, the
statutory scheme for involuntary commitment (1) makes each year=s proceedings discrete, so that the present
proceedings are not necessarily nullified by a reversal in a prior year, and
(2) provides the same basic standard whether the matter is an initial
commitment or a recommitment.  See Tex. Health & Safety Code Ann. ' 574.035, .066 (Vernon 2003).  We also recognize that there is a significant public
safety consideration whenever a trial court deems someone Alikely to cause serious harm to others,@ as the trial court has in the present case.  See
State v. Roland, 973 S.W.2d 665, 667 (Tex. 1998).  Accordingly, we find
that the present year=s proceedings are not rendered moot simply because the
prior year=s order was reversed.  We will therefore review the
current order on the merits.





[2]  The trial court=s
order states generally that appellant Astill
meets the criteria for involuntary commitment.@  At the conclusion of the hearing, the trial judge stated that she Atend[ed] to agree with the assessment that the State
has just announced, i.e., Dr. Moeller=s
testimony in regards to his behavior.@ 
In closing argument, the State=s attorney
spoke to all three of the possible bases for recommitment, including danger to
self and others.  The judge went on to specifically discuss the elements of the
third possible basis for recommitment, i.e., the patient=s distress and the deterioration of his ability to function.





[3]  Although there is some evidence that appellant has
experienced suicidal thoughts in the past, the record does not appear to
reflect that he has previously inflicted harm on himself.  For this and other
reasons, we find the evidence more compelling regarding the likelihood of harm
to others.  Accordingly, we need not address the harm-to-self criterion for
recommitment.





[4]  Appellant points out that the record does not reveal
exactly what medication he refused in February 2007.  As Moeller stated in his
testimony, the important aspect of the occurrence is that appellant
refused medication prescribed by his doctors not what medication he
refused.





[5]  Appellant additionally notes that refusal to take
medication is not per se an overt act sufficient to require commitment, citing In
re F.M., 183 S.W.3d 489, 494-95 (Tex. App.CHouston [14th Dist.] 2005, no pet.).  While we agree with this general
point, the evidence demonstrates that appellant=s refusal to take medication is just one factor among many (as detailed
in this opinion) that warrants appellant=s
continued commitment.





[6]  Appellant discusses in detail the unpublished case
of Whitaker v. State, Nos. 01-03-00576-CV, 01-03-00577-CV, 2003 WL
22413511 (Tex. App.CHouston [1st Dist.] October 23, 2003, no pet.).  The
State=s expert in Whitaker testified that the patient
in question continued to suffer from a mental illness, which involved paranoia
as well as delusions that he owned large amounts of property.  Id. at
*3.  The expert further opined that if released, the patient could Avery easily go on to a piece of property that somebody
else owns and tell them that this is my piece of property, and an argument
[would] ensue.@  Id.  In reversing the trial court=s order of recommitment, the court of appeals held
that the State=s expert improperly relied solely on evidence of the
patient=s mental illness and did not identify a recent overt
act or pattern of behavior that tended to confirm the likelihood of serious
harm should the patient be released.  Id. at *3-4.  In the case before
us, Moeller testified at length regarding not only appellant=s illness but also his current condition and the
specifics of his 2007 decompensation episode.  Based on his analysis of these
factors and appellant=s violent past, Moeller concluded that appellant is
likely to be a danger to others if released.  Consequently, we find appellant=s citation to and discussion of the Whitaker
case to be inapposite.





[7]  The legal basis for appellant=s argument is unclear from his brief; nonetheless, we
will address the argument as raised.





[8]  In support of this assertion, appellant cites T.G.
v. State, 7 S.W.3d 248, 252 (Tex. App.CDallas
1999, no pet.).  In T.G., the court stated that evidence which merely
demonstrates a person is mentally ill is not sufficient to satisfy the
statutory standard for commitment.  Id.  We disagree with appellant=s assertion that the decompensation episode is merely
evidence that appellant has a mental illness.