**The STATE of Texas for the Best Interest and Protection of J.W.**

No. 05–09–01253–CV.

Court of Appeals of Texas, Dallas.

May 12, 2010.

Deborah Farris, Dallas, TX, for Appellant.

Craig Watkins, Dallas County District Attorney, Dallas, TX, for Appellee.

Before Justices RICHTER, LANG–MIERS, and MYERS.

## OPINION

Opinion By Justice LANG–MIERS.

J.W. appeals the trial court's judgment granting the State's application for court-ordered temporary mental health services. J.W. argues that the evidence is insufficient to support the trial court's findings that: (1) she was likely to cause serious harm to herself, and (2) she was deteriorating in her ability to function independently. We conclude that the evidence is legally insufficient to support the trial court's judgment. We reverse the trial court's judgment and render judgment denying the State's application for court-ordered temporary mental health services.

### FACTUAL BACKGROUND

On September 8, 2009, J.W.'s father filed an application for mental illness emergency detention, describing J.W.'s "specific recent behavior, overt acts" as follows: "patient was initially ill & diagnosed 3 yrs. ago and since receiving one month's treatment has refused voluntarily to seek treatment, hasn't been able to work, has no insurance, but has two health issues." The application further identifies J.W.'s health issues as bulemia and a thyroid disorder. The application also indicates that J.W. evidences a substantial risk of serious harm to herself and others because she is "not taking meds," "wandering alone," and "threatening family."

After a judge issued a warrant for her apprehension, J.W. was involuntarily admitted to Green Oaks Hospital on September 10, 2009. On September 11, 2009, the State filed an application for court-ordered temporary mental health services, along with a physician's certificate of medical examination for mental illness, which was completed and signed by Aditya Sharma, M.D. Dr. Sharma's certificate lists J.W.'s diagnosis as Paranoid Schizophrenia and states that Dr. Sharma is of the opinion that J.W. is (1) likely to cause serious harm to herself and others, (2) suffering severe and abnormal mental, emotional or physical distress, (3) deteriorating in her ability to function independently, and (4) unable to make rational and informed decisions about whether to submit to treatment. Under the heading "objective reasons, observed behaviors, of why the 'risk of harm to self or others,'" the certificate states: "Very Disorganized, paranoid[,] aggressive toward family," "wandering in dangerous areas," and "vomitus all over her apartment—not able to care for herself due to psychosis." The certificate describes J.W.'s mental status as "disorga-

nized/fragmented thoughts," "delusions—persecutory/paranoid," and "illogical."

J.W. was later transferred to Terrell State Hospital and evaluated by Margaret Weidow, M.D. on September 23, 2009. Dr. Weidow's certificate of medical examination for mental illness describes the following acts committed by J.W.:

  a. ARGUES [WITH] STAFF [ABOUT] WHY THEY QUESTION HER

  b. DEMANDED [TREATMENT] FOR GOITER & THEN REFUSED [TREATMENT]

  c. REFUSED VISIT [WITH] FAMILY & WON'T ALLOW U.S. TO TELL THEM ANYTHING

The certificate describes J.W.'s mental status as follows:

  a. PARANOID BEHAVIOR

  b. PARANOID DELUSIONS

  c. DENIES [SUICIDAL IDEATION]/[HOMICIDAL IDEATION]

  d. POOR JUDGMENT, NO INSIGHT

The trial court held a hearing on the State's application for temporary mental health services on September[1] 24, 2009. At that hearing, Dr. Weidow testified that J.W. was likely to cause serious harm to herself. When asked to explain the basis for her opinion, Dr. Weidow responded,

> The patient doesn't accept that she has a mental illness and, as a result, is extremely paranoid and is disorganized and puts herself in dangerous situations. She described to me yesterday that she has a studio here and, she said,—I'm trying to remember the exact words she used. What I interpreted as an area that's not too safe. And she says she's been broken into. She had a man come

urinate next to her car. I see that as putting herself in dangerous positions where people could injure her.

Dr. Weidow also testified that J.W.'s family applied for a mental illness warrant because "[t]hey were concerned about what they saw as her deterioration." According to Dr. Weidow, the family's concern arose after J.W. got in "a struggle" with her aunt that involved pushing and shoving. J.W.'s family also learned that she was being evicted from her apartment, which was "in real disarray," with "vomit in various containers around the apartment." Dr. Weidow also testified that after J.W. was transferred from Green Oaks to Terrell, J.W. was very isolated and irritable, but was not violent. J.W. complained of a thyroid problem, but the results from her lab work were normal and she refused to allow the hospital to perform a scan.

During cross-examination, Dr. Weidow testified that J.W. has "at least a two-year history" of paranoid schizophrenia and refuses to take any medication. J.W. would not give consent to allow officials at the hospital to talk with her family because "[s]he feels her family is plotting against her in order to get control of her finances." Dr. Weidow testified that J.W. was not a candidate for out-patient treatment "because she refuses to accept that there is a problem or that she needs help."

J.W.'s father, L.W., testified at the hearing that J.W. is mentally ill and cannot take care of herself. When L.W. went to J.W.'s apartment to pick her up, he found "[l]ittle bitty pieces of trash" all over the floor, and no furniture. According to L.W., J.W. is bulimic and he thinks there were containers of vomit in her apartment.

---

1. The reporter's record erroneously states that the hearing occurred on the "24th day of October, 2009."

There were pins stuck in the floor because J.W. was "trying to make trinkets to sell."

J.W.'s sister, K.W., testified at the hearing that she believed J.W. needed to be committed because "she's been having these symptoms for several years now, about two and a half or three years." According to K.W., J.W. is paranoid and delusional. J.W. thought someone stole her phone out of her car and then put it back. J.W. took a suitcase with her to job interviews because she was afraid that someone was going to steal her documents. K.W. also testified that J.W. "doesn't feel like she has a problem or a mental illness" and refuses to take her medicine.

J.W. also testified at the hearing. She testified that she has a masters degree in fine arts from the University of Houston. She acknowledged that she elected to go to a hospital in Alabama in 2007 and was diagnosed at that time with "psychosis NOS." She testified that the bag she took to a job was a roller bag like a lot of students and professionals use. J.W. was not asked about the incident with her aunt. When asked whether she had cups of vomit in her apartment, J.W. responded, "There was one cup of vomit when they came and bombarded me and I threw up." And when asked whether she feels that she currently has a mental illness, J.W. responded, "No. I feel like I'm shaken by the environmental things that have happened, and I think that's very normal." She testified that she was diagnosed with a goiter. She said she refused to allow hospital officials to scan her because she was already tested at another hospital and "[a]ll they have to do is send out for the records." When asked whether she would go to out-patient treatment if ordered to do so, J.W. essentially explained that she is not willing to listen to doctors whom she believes "barely assess their patients" and make "broad, politician-like statements" that are unrelated to her care. J.W. indicated that, if she was released, she would go to a shelter until she could find placement.

The trial court signed a judgment on September 24, 2009, committing J.W. to Terrell State Hospital for a period of time not to exceed 90 days.[2] The trial court included findings in its judgment that J.W. is mentally ill, and as a result, (1) is likely to cause serious harm to herself, and (2) is suffering severe and abnormal mental, emotional, or physical distress and is deteriorating in her ability to function independently, and is unable to make rational and informed decisions about her treatment. J.W. timely filed her notice of appeal.

### APPLICABLE LAW

Subsections (a) and (d) of section 574.034 of the Texas Health and Safety Code state the applicable criteria for court-ordered temporary inpatient mental health services. Under those subsections,

(a) The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

(C) is:

---

**2.** Although the 90–day commitment period has run, this appeal is not moot. *See State v. Lodge,* 608 S.W.2d 910, 912 (Tex.1980); *D.J. v. State,* 59 S.W.3d 352, 354 (Tex.App.-Dallas 2001, no pet.).

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

. . .

(d) To be clear and convincing under Subsection (a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:

(1) the likelihood of serious harm to the proposed patient or others; or

(2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(a), (d) (Vernon 2003). Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex.1979) (per curiam); *In re S.C.*, No. 05–08–00373–CV, 2008 WL 3412222, at *4 (Tex.App.-Dallas Aug. 13, 2008, no pet.) (mem.op.). ■ The expert's opinions and recommendations must be supported by a showing of the factual bases on which they are grounded. *In re S.C.*, 2008 WL 3412222, at *4. An expert diagnosis of mental illness, standing alone, is not sufficient to confine a patient for treatment. *Id.* Likewise, evidence that merely reflects a patient's mental illness and need for hospitalization is not sufficient to meet the State's burden. *Id.*

## STANDARD OF REVIEW

Because the State's burden of proof is clear and convincing evidence, we apply a heightened standard of review. In reviewing a legal sufficiency claim, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable fact-finder "could form a firm belief or conviction that the matter that must be proven is true." *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). We assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, and we disregard all contrary evidence unless a reasonable fact-finder could not. *Id.; see also City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). When reviewing factual sufficiency, we must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction that the allegations in the petition were true. *In re J.F.C.*, 96 S.W.3d at 266.

## ANALYSIS

■ J.W. raises three issues on appeal. In her first two issues, J.W. challenges the legal and factual sufficiency of the evidence to support the trial court's findings that she was a danger to herself and that she was experiencing deterioration of her ability to function independently. In her third issue J.W. challenges the legal and factual sufficiency of the evidence to support the trial court's finding "of an overt

act or continuing pattern of behavior that relates to the criteria on which the judgment is based."

J.W. does not challenge the trial court's finding that she is mentally ill, and we do not question her family's concern, or Dr. Weidow's opinion that J.W. would benefit from hospitalization. Nevertheless, the fact that J.W. is mentally ill and would benefit from hospitalization is not enough to satisfy the statutory requirements to commit her, against her will, to inpatient mental health services. "The statutory requirements for an involuntary commitment are strict because an involuntary commitment is a drastic measure." *In re S.C.,* 2008 WL 3412222, at *4 (internal quotation omitted).

### Was J.W. likely to cause serious harm to herself?

The evidence is somewhat inconclusive with respect to the vomit in J.W.'s apartment. J.W. testified she threw up once at her apartment, when she was confronted by her family. Although Dr. Weidow testified that there was "vomit in various containers" in J.W.'s apartment, she also acknowledged that she did not see the containers herself and did not talk to J.W. about them. And when J.W.'s father was asked if there was vomit in containers inside J.W.'s apartment, he answered somewhat equivocally: "Yes, I think." Even if J.W. vomited in her apartment, however, there is no evidence that it posed a serious health risk to J.W. And there is no evidence in the record that J.W. was malnourished or suicidal. As a result, we conclude that the evidence in the appellate record does not demonstrate a likelihood of serious harm to J.W. sufficient to satisfy the requirements of the statute. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(A), (d)(1). Additionally, J.W.'s paranoid and delusional statements do not amount to clear and convincing evidence that J.W. is likely to cause serious harm to herself. *See, e.g., In re T.G.,* 7 S.W.3d 248, 252 (Tex.App.-Dallas 1999, no pet.) (appellant's beliefs that a mail carrier was responsible for her and that she was in the military did not demonstrate likelihood of serious harm to appellant). Because there is no evidence of a recent overt act or continuing pattern of behavior that tends to confirm that J.W. was likely to cause serious harm to herself, we conclude that the evidence is legally insufficient to support involuntary commitment under subsection 574.034(a)(2)(A). *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(A), (d)(1); *cf. In re R.M.,* 90 S.W.3d 909, 911–12 (Tex.App.-San Antonio 2002, no pet.) (evidence that appellant left lit candles unattended, left family home and walked deserted streets at night, accepted rides from strangers, and was so provocative that she could provoke people into violence towards her was sufficient to support finding, by clear and convincing evidence, that appellant was likely to cause serious harm to herself).

### Was J.W. deteriorating in her ability to function independently?

Because we have concluded that the evidence was legally insufficient to support involuntary commitment under subsection 574.034(a)(2)(A), we next analyze whether the evidence was legally sufficient to support involuntary commitment under subsection 574.034(a)(2)(C). J.W. argues that the evidence is legally insufficient to support involuntary commitment under subsection 574.034(a)(2)(C) because there is no evidence that she was experiencing substantial deterioration of her ability to function independently, as required by subsection 574.034(a)(2)(C)(ii). We agree with J.W.

Although Dr. Weidow answered "Yes" to the general question of whether J.W. was deteriorating in her ability to function in-

dependently, Dr. Weidow was not asked to describe the basis for her answer, nor was she asked to describe why she concluded that J.W.'s ability to provide for her own basic needs had deteriorated. There is no evidence in the record that, as a result of mental illness, J.W. could not provide for her own food, clothing, or health. And the only testimony concerning J.W.'s safety was Dr. Weidow's testimony that J.W. told her that "she's been broken into" and that "[s]he had a man come urinate next to her car." But there is no evidence about when either of these incidents occurred, and Dr. Weidow's testimony about these two incidents does not demonstrate by clear and convincing evidence that J.W.'s mental illness renders her unable to provide for her own personal safety. It is undisputed that J.W. refused to take psychiatric medication. But this fact alone does not demonstrate by clear and convincing evidence that J.W. was deteriorating in her ability to function independently. *See, e.g., In re C.C., III*, 253 S.W.3d 888, 894 (Tex.App.-Dallas 2008, no pet.) ("The evidence that appellant had stopped taking his medication before his commitment and refused to take his medicine in the hospital is not evidence of deterioration of ability to function independently.").

There is evidence that J.W. was living in an apartment with no furniture, did not have a job or health insurance, and was being evicted from her apartment. But while this evidence may suggest that J.W. is indigent, section 574.034 specifically excepts "reasons of indigence" as a basis for a finding that a proposed patient cannot provide for her basic needs. *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C)(ii); *D.J. v. State*, 59 S.W.3d 352, 356 (Tex.App.-Dallas 2001, no pet.) ("Although part of the statutory standard is satisfied by evidence the proposed patient is unable to provide for her basic needs, the statute specifically excepts

'reasons of indigence' as a basis for such a finding."). The record does not contain evidence, apart from circumstantial evidence of indigence, that would enable a reasonable fact-finder to form a firm belief or conviction that J.W. cannot provide for her basic needs as a result of her mental illness. *See, e.g., In re S.C.*, 2008 WL 3412222, at *5. And J.W.'s paranoid and delusional statements do not amount to clear and convincing evidence that J.W. is deteriorating in her ability to function independently. *See, e.g., In re C.C., III*, 253 S.W.3d at 893–94. Because there was no evidence of a recent overt act or continuing pattern of behavior that tends to confirm that J.W. was experiencing substantial deterioration of her ability to function independently, we conclude that the evidence is legally insufficient to support involuntary commitment under subsection 574.034(a)(2)(C). *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C), (d)(2); *cf. Goldwait v. State*, 961 S.W.2d 432, 433, 435 (Tex.App.-Houston [1st Dist.] 1997, no writ) (evidence, for example, that appellant "(1) wanted to start an international organization in order to provide his and his brothers' genetically superior blood to various hospitals to use for treatment of immune diseases; (2) had sold all of his belongings;" (3) asked his brother to get suction supplies so that he could let his and his brother's blood; and (4) slept in his brother's driveway one night because "the sun, stars, and moon all emitted particles that drained his gray matter" clearly and convincingly established elements under subsection 574.034(a)(2)(C)); *L.S. v. State*, 867 S.W.2d 838, 842–43 (Tex.App.-Austin 1993, no writ) (evidence, for example, that appellant "ritualistically burned the skin on his fingers with cigarettes," "'plow[ed]' out into the street without looking," drank sufficient water to gain ten pounds in one day and cause long-term

health consequences, "had been assaulted on several occasions because he is intrusive," stuck nine-volt batteries to the exposed roots of his teeth, and "sometimes used his hands to clean himself after defecating, leaving feces smeared on his clothes" was sufficient to support finding by clear and convincing evidence that appellant was suffering severe distress and deteriorating in his ability to function independently).

### CONCLUSION

We sustain J.W.'s legal-sufficiency challenges. As a result, we do not need to address her factual-sufficiency challenges. We reverse the trial court's judgment and render judgment denying the State's application for court-ordered temporary mental health services.