

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00054-CV

THE STATE OF TEXAS FOR THE BEST INTEREST
AND PROTECTION OF R.J.R.

On Appeal from the County Court at Law
Lamar County, Texas
Trial Court No. 123-13

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

R.J.R.'s bizarre behavior at Paris Junior College resulted in a jury trial on the State's request for his involuntary commitment as an inpatient for mental health treatment and an order that he be given psychoactive drugs in his treatment. The State proved, and the jury found, some, not all, of the elements to allow involuntary inpatient mental health treatment for R.J.R. The trial court ordered involuntary inpatient treatment and the administration of psychoactive drugs. R.J.R.'s appeal challenges the judgment both as to the inpatient treatment and the psychoactive drugs. We reverse the judgment of the trial court, because (1) involuntary inpatient mental health treatment is not supported by the evidence and (2) the ordered administration of psychoactive drugs must fall with the inpatient commitment order.

*(1)    Involuntary Inpatient Mental Health Treatment Is Not Supported by the Evidence*

On November 1, 2012, R.J.R. was using a computer at the Paris Junior College Library, reportedly to access Match.com, a dating website. After experiencing computer problems, he went to confront the Dean to inform him that library employees were "sabotaging my computer . . . because of my religion." There is some suggestion that the meeting did not produce the result sought by R.J.R., that he got agitated and raised his voice, and that security was called.

Paris Police Lieutenant James Mazy testified that he responded to a request for assistance placed by Shane Boatwright, Paris Junior College's chief of police. Mazy joined Boatwright's chase of R.J.R., warning him to stop. Instead of complying with Mazy's command, R.J.R. used a telephone pole to "sling[] himself around" and "head butted Lieutenant Mazy in the side." Mazy testified that he was in extreme pain and had suffered a contusion after he had been "head

2

butted." R.J.R. was "hollering" and resisting officers' efforts to handcuff him. Captain Terry Bull testified that, on the day of the incident, R.J.R. was carrying "a butcher knife or a kitchen knife" with a blade that was "[s]ix and three quarter inches" long. R.J.R. was charged with evading arrest.

After it was established that R.J.R. believed "his computer at Paris Junior College [was] sabotaged and that people [were] constantly trying to provoke or plot against him" and that he "struck a law enforcement officer after the officer attempted to make contact with him because he believed that the law enforcement officer was going to attack him," Dr. David Bell was hired to conduct a competency and insanity evaluation. R.J.R. "mailed numerous journal entries . . . to Dr. Bell requesting that Dr. Bell read it before his appointment." In a January 23, 2013, letter to Bell, R.J.R. complained about Bell's "false diagnosis" and made further allegations:

> [M]any Public Officials had False Arrested ME in order to Provoke ME to Anger, Taunt ME to Anger, Entrapment and Character Assassination against ME. And this should also prove to You that the Public Officials are all protecting each other in order to coverup their "Religious Discrimination."

In an October 2012 journal entry, after witnessing a woman whom he believed he had seen on Match.com walking with "a Black Boyfriend," R.J.R. wrote, "[T]his Institution of Civil Society is secretly, subtly, and Intentionally manipulating, sabotaging and setting ME up by Destroying all my 'Beautiful Relationships' on (www.Match.com) . . . ." The journal entries also expressed his belief that he was being watched and followed by Paris Junior College employees and by employees and "agents" of a local grocery store. R.J.R. closed his journal entries with the notation "Persecuted, Tortured, Starved, Mal-Nourished, Drug[g]ed, Poisoned, Blacklisted, Manipulated, Sabotaged and Setup."

During a February 20, 2013, insanity evaluation of R.J.R., Bell wrote that R.J.R. "stated that he was diagnosed with bipolar disorder," "was in 5 mental hospitals and . . . the hospitals put antipsychotic medication in his food," and "believes that people are constantly trying to provoke him and plot against him."  According to Bell, R.J.R. described the incident that led to his arrest:

> He says that he . . . left the Dean's office when he was confronted by a security guard who chased him.  He stated that he became frightened and ran; then a SUV with "Sheriff" on the side pulled up and persons in plain clothing stepped out and threatened him with their fists.  He then struck the person, who was of course a sheriffs [sic] deputy.  He admitted grudgingly that the persons could have been sheriffs [sic] deputies and was aware that not all police uniforms are blue.  He appeared evasive on this point and to only grudgingly admit that the persons could have been police.

Bell noted,

> [R.J.R.] stated that he believes that police frequently observe him when he is walking around town.  He has a number of similar beliefs that could be characterized as paranoid.  In addition his belief that his computer at Paris [J]unior [C]ollege was sabotaged appears to be a paranoid delusion.
>
>     . . . .
>
> He spends a lot of time writing in journals, and he brought a number of journals with him.  The overriding theme of these journals is that he is not mentally ill and that he has been wronged by society.  He appears to feel entitled to inheriting his father's farm, and to a devoted wife, since he lost those things in the past.  This type of journaling is typical for a paranoid individual.

After finding that R.J.R. was insane at the time of the offense, Bell opined,

> I believe that [R.J.R.] is dangerous.  He harbors extensive paranoid delusions about others and he has now shown himself capable of aggressive behavior.  He has approached public officials in a way that made them perceive that he needed to be detained.  This includes the PJC Dean, the security personnel, and the sheriffs [sic] department.  It is possible that he could plot revenge of some kind on a number of persons including family members, the police, Paris Junior College personnel, or others.

4

I believe that he should be committed for treatment.

R.J.R., who was found competent to stand trial by Bell, was found not guilty of evading arrest or detention by reason of insanity April 16, 2013.

On April 17, 2013, the State filed an application for court-ordered temporary mental health services, which was supported by two physician's certificates of medical examination for mental illness. Dr. Raza Sayed examined R.J.R. on April 17, diagnosed him with "psychosis disorder not otherwise specified," stated that R.J.R. is "paranoid," and recommended inpatient treatment. Dr. Fernando M. Siles diagnosed R.J.R. with "paranoid disorder," stated that R.J.R. was "in denial about his mental illness," and concluded that R.J.R. had "severe mental illness with paranoia and violent tendencies" and that he needed to be in a "safe hospital environment." On the same day, the trial court issued an order of protective custody ordering that R.J.R. be taken to Glen Oaks Hospital, determining that "an adequate factual basis exists for probable cause to believe that [R.J.R.] (Proposed Patient) presents a substantial risk of serious harm to self or others, such that the Proposed Patient cannot be at liberty pending the commitment hearing."

The commitment hearing was conducted in front of a jury May 10, 2013. Sayed testified he treated R.J.R. during his stay at Glen Oaks Hospital. After Sayed's certificate of medical examination was admitted as an exhibit, he testified that the diagnosis "can be defined as a temporary loss of touch with reality." Based on R.J.R.'s conversations, Sayed believed he was "at imminent risk of harm so he needed stabilization." During R.J.R.'s stay at Glen Oaks Hospital, Sayed wanted to treat him with antipsychotic medication, but R.J.R. "refused

5

treatment" and did not participate in stress management activities "because in his belief he was not mentally ill."

Nevertheless, Sayed testified, "[O]ver the course of his stay at the hospital his paranoia appeared to subside in its intensity, and he did not show any overt acts of violence . . . and did not make any further threats of violence against himself or anyone else." In fact, R.J.R.'s "level of psychosis appeared to reduce even without medication treatment." Accordingly, R.J.R. was discharged from Glen Oaks Hospital on April 29, 2013.

Sayed warned, however, that it would be possible that R.J.R.'s psychosis could "spike again." He clarified that, while "the standard that is used for a forced medication petition to be pursued was not met in the fact that he had not shown . . . imminent risk of harm," it was in R.J.R.'s "best interest to stay in treatment." Sayed testified that he would not release someone who was a danger to themselves.

Siles testified that, as R.J.R.'s stress level decreased, his mental state could improve without medication. He also confirmed that R.J.R. was "not showing any evidence of imminent risk o[f] harm to self or others" when the decision was made to discharge him. On May 2, 2013, a crisis assessment at Lakes Regional Mental Health Center also determined that R.J.R. "does not pose as a threat to himself or others at this time."

The jury next heard from Bell. Bell has a doctorate in psychology, but is "not a medical doctor" and is not licensed to practice medicine in Texas. He had never reviewed any of R.J.R.'s medical records and did not conduct any testing during the sanity and competency evaluations. Nevertheless, Bell testified that, in his "medical opinion," R.J.R. would not see improvement

6

with treatment without medication. Bell also claimed that R.J.R. was a danger to himself and others and would require medication to "push the delusions into the background so that the person is no longer acting on paranoid beliefs about other people." Bell concluded that R.J.R. "should be placed inpatient into a psychiatric facility which would no doubt administer medication to him."

Harry Patel, owner of King's Inn Motel, testified that R.J.R. had been a tenant for five years, that they engaged in normal conversation, and that he had never been late on a rent payment. Patel had never been in fear of him, seen R.J.R. upset, or experienced any problem with him.

Captain Bull testified he was not aware of any other incidents caused by R.J.R. since the incident of November 1, 2012. Bull stated that he had previous contact with R.J.R. "while investigating a suspicious person" and "in regard to other incidents where [he] was contacted with him being uncooperative with individuals." Bull testified that he had previously observed R.J.R. in a condition or location where he might hurt himself or others. However, Bull clarified that his contacts with R.J.R. were few and far between and did not constitute a continuing pattern of behavior.

R.J.R. also testified that, since November 1, 2012, he had not had any incidents or run-ins with law enforcement or others. He claimed that he was carrying a knife because "I like to protect myself because this society is getting worse and worse." During cross-examination, it was established that R.J.R. had been arrested in excess of five times for criminal trespass before 2001 because he was sleeping on other people's property when he was "forced on the street"

during a particular time in his life. R.J.R.'s remaining testimony consisted of bizarre stories of times he felt people were following or watching him, including his belief that grocery store employees and "agents" were "chasing" and recording him in the grocery store with the intention to "put something in [his] bags" and falsely accusing him of theft. He testified that the government was trying to discriminate against him for starting a new religion, which he classified as "the true doctrine of Jesus Christ and God in the Holy Bible." R.J.R. believed he would not benefit from medication because he was not delusional and stated, "[I]t's a total waste of taxpayer's money. They want to drug you up for everything." R.J.R. also testified that he had never acted based on his journal entries.

After hearing the testimony and viewing the evidence, a jury found that R.J.R. (a) was mentally ill; (b) would, if not treated, "continue to suffer severe and abnormal mental, emotional, or physical distress and continue to experience deterioration of the ability to function independently"; and (c) was "unable to make a rational and informed decision as to whether or not to submit to treatment."

The trial court entered an order for temporary inpatient mental health services and issued a writ of commitment May 10, 2013. On appeal, R.J.R. challenges the sufficiency of the evidence supporting the jury's verdict and complains that the charge "contained the language of a superseded version of Section 574.034."

At the time of his release, physicians had determined that R.J.R. was not a threat to himself or others. "[A] State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing

and responsible family members or friends." *State ex rel. S.W.*, 356 S.W.3d 576, 579 (Tex. App.—Texarkana 2011, no pet.) (citing *O'Connor v. Donaldson*, 422 U.S. 563, 576 (1975)). "The requirements for an involuntary commitment are strict because an involuntary commitment is a drastic measure." *Id.*; *see In re Best Interest & Protection of C.O.*, 65 S.W.3d 175, 182 (Tex. App.—Tyler 2001, no pet.); *In re Breeden*, 4 S.W.3d 782, 789 (Tex. App.—San Antonio 1999, no pet.). "The evidentiary standards for involuntary commitment are high." *State ex rel. E.E.*, 224 S.W.3d 791, 794 (Tex. App.—Texarkana 2007, no pet.).

In reviewing legal sufficiency, we analyze "'whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.'" *State ex rel. L.T.*, 386 S.W.3d 271, 274 (Tex. App.—Texarkana 2012, no pet.) (quoting *Williams v. Nationstar Mortg.*, 349 S.W.3d 90, 92–93 (Tex. App.—Texarkana 2011, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We are to consider all of the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference that would support it. *Id.* (citing *Wilson*, 168 S.W.3d at 822). The jury is the only judge of witness credibility and weight to give to testimony. *Id.* We "'cannot substitute [our] judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement,'" but when the evidence allows only one inference, "'the reviewing court may [not] disregard it.'" *Id.* (quoting *Wilson*, 168 S.W.3d at 822); *see State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).

In reviewing factual sufficiency challenges, we review all the evidence in the record, both supporting and running counter to the jury's findings. *L.T.*, 386 S.W.3d at 274 (citing *In re C.H.*, 89 S.W.3d 17, 27–29 (Tex. 2002); *State ex rel. L.H.*, 183 S.W.3d 905, 910 (Tex. App.—

9

Texarkana 2006, no pet.)). "'Under the clear and convincing standard, we determine whether the evidence is such that the trier of fact could reasonably form 'a firm belief or conviction' as to the truth of the allegations sought to be established by the State.'" *Id.* (quoting *L.H.*, 183 S.W.3d at 910). We consider whether the disputed evidence is such that a reasonable jury could not have reconciled the disputed evidence in favor of its finding. *Id.*; *see In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

Here, the jury found that R.J.R. was not a threat to himself or others.[1] The jury did find, however, that R.J.R. was suffering severe and abnormal mental, emotional, or physical distress, that he "would continue to experience deterioration of the ability to function independently," and that he was unable to make a rational and informed decision as to whether to submit to treatment.[2]

To support involuntary inpatient commitment, the jury was required, by clear and convincing evidence, to find that there was substantial deterioration in R.J.R.'s ability to function independently, "exhibited by [his] inability, except for reasons of indigence, to provide for [his] basic needs, including food, clothing, health, or safety." TEX. HEALTH & SAFETY CODE ANN.

---

[1]Because the jury specifically rejected the idea that R.J.R. posed a serious threat of harm to himself or others, in order for the trial court's order for inpatient treatment to stand, the statutory requirements of Section 574.034(a)(2)(C) and (d) of the Texas Health and Safety Code must be met. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(C), (d) (West 2010). The State "concedes that the jury charge submitted in the instant cause . . . does not contain . . . any reference to the patient's inability to provide for his basic needs."

[2]The State concedes that the "jury charge did not exactly track the statutory language of Texas Health & Safety Code, Section 574.034(a)," but argues that the "difference between the statutory language and the jury instructions do not mandate reversal of the trial court commitment." The State also argues that "R.J.R. failed to object to what he now labels as an incorrect charge." For the reasons explained in the main body of this opinion, reversal is necessary because there is insufficient evidence to meet the statutory requirements for court-ordered inpatient mental health treatment. We resolve R.J.R.'s complaints based on sufficiency of the evidence.

10

§ 574.034 (a)(2)(C)(ii) (West 2010). To be clear and convincing, the evidence was required to include "a recent overt act[3] or a continuing pattern of behavior that tends to confirm [R.J.R.'s] distress and the deterioration of [his] ability to function." TEX. HEALTH & SAFETY CODE ANN. § 574.034(d)(2). The recent overt act or continuing pattern of behavior must relate to the criterion on which the judgment is based. *In re F.M.*, 183 S.W.3d 489, 492 (Tex. App.— Houston [14th Dist.] 2005, no pet.); *T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.—Dallas 1999, no pet.).

The record before us contains no evidence that R.J.R. was unable to provide for his basic needs. Testimony from R.J.R.'s landlord demonstrated that R.J.R. had lived at the same place for five years and had never been late on rent. The jury reviewed a letter from R.J.R. in which he stated that he received $850.00 per month in Social Security income and heard testimony that R.J.R. went grocery shopping. There was also no evidence suggesting that R.J.R. would be unable to afford medication.

The evidence established that R.J.R. was delusional and suffered from psychosis. "Evidence of psychosis, hallucinations, or delusions, without more, cannot justify involuntary commitment." *State ex rel. S.K.*, No. 06-13-00023-CV, 2013 WL 1867626, at *3 (Tex. App.— Texarkana May 3, 2013, no pet. h.) (mem. op.). "Even when the evidence establishes that an individual is mentally ill and in need of hospitalization, such evidence does not meet the statutory standard for involuntary commitment." *S.W.*, 356 S.W.3d at 580. Further, "[e]vidence of refusal to take medication, alone, is not an overt act or continuing pattern of behavior tending

---

[3]Overt acts include both physical acts and oral statements. *State v. K.E.W.*, 315 S.W.3d 16, 21–22 (Tex. 2010).

to confirm a proposed patient's distress or a deterioration of ability to function." *State ex rel. E.R.*, 287 S.W.3d 297, 306 (Tex. App.—Texarkana 2009, no pet.).

We conclude that the State failed to provide evidence to show that R.J.R. was experiencing deterioration of his ability to function independently—the question which was submitted to the jury. Further, involuntary commitment is not supported, because the State also did not provide any evidence—as required by the statute—that R.J.R. was *substantially deteriorating in his ability to function independently, exhibited by his inability to provide for his basic needs, including food, clothing, health, or safety*. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)(2)(C)(ii); *State ex rel. C.C., III*, 253 S.W.3d 888, 893–95 (Tex. App.—Dallas 2008, no pet.); *State ex. rel. C.R.W.*, No. 06-08-00028-CV, 2008 WL 1839031, at **7–8 (Tex. App.—Texarkana Apr. 25, 2008, no pet.) (mem. op.).

We sustain R.J.R.'s point of error challenging the sufficiency of the evidence.

*(2)* *The Ordered Administration of Psychoactive Drugs Must Fall With the Inpatient Commitment Order*

R.J.R. also challenges the trial court's order for the administration of psychoactive medication. A court may order the administration of psychoactive medication if the patient in question is under a court order to receive inpatient mental health services. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.106(a)(1) (West 2010). Because we reverse the trial court's order for inpatient mental health services, R.J.R. is not under a court order to receive mental health services. Therefore, the order authorizing the administration of psychoactive medication is invalid.

12

We reverse the trial court's judgment ordering inpatient treatment and the administration of psychoactive medication. We further order R.J.R.'s immediate release from involuntary commitment. *S.W.*, 356 S.W.3d at 582 (citing TEX. HEALTH & SAFETY CODE ANN. § 574.033(b) (West 2010); TEX. R. APP. P. 43.2(c)).

Josh R. Morriss, III
Chief Justice

Date Submitted:     June 25, 2013
Date Decided:       July 3, 2013

13